**Vera FURTULA and Anthony Miller, Appellants**

v.

**UNIVERSITY OF KENTUCKY, University Board of Trustees, and PNC Bank, National Association, as successor by Merger to National City Bank, Trustee ("PNC"), Appellees.**

No. 2011–SC–000332–DG.

Supreme Court of Kentucky.

June 19, 2014.

As Modified June 23, 2014.

Rehearing Denied Sept. 18, 2014.

versity of Kentucky is shielded by the doctrine of governmental immunity from the claims of employees who assert that the University breached contractual obligations to provide them with benefits under a long-term disability compensation program adopted by the University.

Mendel Austin Mehr, Philip Gray Fairbanks, Counsel for Appellants Vera Furtula and Anthony Miller.

Stephen L. Barker, Barbara Ann Kriz, Joshua Michael Salsburey, Christopher S. Turner, Counsel for Appellees University of Kentucky and University Board of Trustees.

Dustin Elizabeth Meek, Jonathan Todd Salomon, Counsel for Appellee PNC Bank, National Association, as successor by Merger to National City Bank, Trustee.

Opinion of the Court by Justice VENTERS.

In this opinion, we review an opinion of the Court of Appeals holding that the Uni-

■■■ The state universities of this Commonwealth, including the University of Kentucky, are state agencies that enjoy the benefits and protection of governmental immunity except where it has been explicitly waived by the legislature.[1] Included within the provisions of KRS Chapter 45A, the Kentucky Model Procurement Code, is KRS 45A.245, by which the General Assembly has explicitly waived the defense of "governmental immunity" for claims based upon "lawfully authorized written contracts with the Commonwealth."[2] The employees cite this provision as the sole statutory authority supporting their position that the legislature

---

1. Since the University of Kentucky is a state agency, and not the state itself, they can only have governmental immunity, which while related to and flowing from sovereign immunity, is nevertheless a slightly different concept. *See Comair, Inc. v. Lexington–Fayette Urban County Airport Corp.*, 295 S.W.3d 91, 94 (Ky. 2009) (discussing the "law of sovereign immunity, and the related doctrine[ ] of governmental immunity"); *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky.2001) (noting that "governmental immunity" is different from but is "derived from the traditional doctrine of sovereign immunity"). The difference between the two is that sovereign immunity is absolute and an inherent aspect of the state, whereas a state agency's immunity is qualified to the extent that its existence depends on whether the agency is performing a governmental or proprietary function. *See Yanero*, 65 S.W.3d at 519. However, to the extent that the agency is performing a governmental function, as a state university does, its governmental immunity is functionally the same as sovereign immunity. *Id.* ("[A] state agency is entitled to immunity from ... liability to the extent that it is performing a governmental, as opposed to a proprietary, function."). Because the immunities are similar, closely related, and indeed functionally the same as long as the entity is acting in a governmental capacity, the case law frequently uses the term "sovereign immunity" when discussing the immunity of state agencies. *See id.* (noting the terms are frequently used "interchangeably").

2. KRS 45A.245 states: "(1) Any person, firm or corporation, having a lawfully authorized written contract with the Commonwealth at the time of or after June 21, 1974, may bring an action against the Commonwealth on the contract, including but not limited to actions either for breach of contracts or for enforcement of contracts or for both. Any such action shall be brought in the Franklin Circuit Court and shall be tried by the court sitting without a jury. All defenses in law or equity, except the defense of governmental immunity, shall be preserved to the Commonwealth. (2) If damages awarded on any contract claim under this section exceed the original amount of the contract, such excess shall be limited to an amount which is equal to the amount of the original contract."

has expressly waived sovereign immunity in situations involving written contracts between state universities and their employees. Consequently, we must determine whether the employee handbook, personnel policies, and related documents of the University of Kentucky establishing a long-term disability compensation program for its employees constitute a "written contract," and, if so, whether they are "written contracts" that fall within the waiver of governmental immunity set forth in KRS 45A.245.

For the reasons explained below, we conclude that the Appellants did not have a "written contract" with their university employer concerning the long-term disability compensation program. Accordingly, we affirm the decision of the Court of Appeals in dismissing Appellants' claims on the basis of governmental immunity.

Our conclusion that Appellants' claims are not based upon a *written* contract with their university employer makes it unnecessary for us to address the scope of KRS 45A.245 in detail.[3] We therefore decline to do so, leaving the examination of that issue for another day, and for a case, unlike this one, in which the resolution of that controversy would be material to our decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

We begin our discussion by briefly summarizing the employment claims asserted by the Appellants, and the relevant employment documents upon which they rely in support of their claims to disability benefits.

Appellants Vera Furtula and Anthony Miller were employed for several years by the University of Kentucky. During the time of their employment, the University provided, at no cost to the employee, a self-funded, long-term disability (LTD) benefits program for its regular full-time employees. The program consisted of two complementary plans: (1) the University of Kentucky Initial Salary Continuation Long–Term Disability Plan ("Salary Continuation Plan"); and (2) the University of Kentucky Long–Term Disability Plan ("LTD Plan").

The LTD program is governed by three sets of documents: an employee handbook titled "Staff Handbook"; Human Resources Policies and Procedures (HRP & P) Sections 90.0 and 95.0; and documents adopted by the Board of Trustees that create and govern the programs. The handbook is provided to employees who sign an acknowledgement of having received it. As stated in the University's HRP & P, the "LTD program is intended to make monetary benefits available to an employee in the event of long term total disability."

The Salary Continuation Plan and the Long–Term Disability Plan each provide that "[a participating employee] who becomes totally disabled as a result of accidental bodily injury or sickness ... shall be entitled to [the payments specified by the respective plan.]" Independently of each other, both Furtula and Miller applied for disability benefits, each claiming to have become totally disabled while working at the University. In each case, the University denied the claim after concluding that Furtula and Miller were not "totally disabled."

**3.** The Court of Appeals has previously expressed doubt about the applicability of KRS 45A.245 and the Kentucky Model Procurement Code in the context of employment contracts. See *Ashley v. University of Louisville,* 723 S.W.2d 866, 867 (Ky.App.1986) ("[W]e consider the language of KRS 45A.010 to limit the chapter's application to the procurement of items of hardware and services subject to bidding procedures.").

Following the rejection of their claims, Furtula and Miller each filed suit in the Fayette Circuit Court against the University alleging that, by rejecting their applications for disability benefits, the University breached a written contract consisting of the Staff Handbook and the associated personnel policy documents that define the disability compensation programs.

In Furtula's case, the University moved for summary judgment, arguing that it was entitled to sovereign immunity because it had no contract with Furtula, and that even if the disability program could be construed as a contract, the action on it was barred because it was not in writing. The Fayette Circuit Court denied the University's motion for summary judgment, concluding that there existed "a material issue of fact with regard to whether there has been a waiver of sovereign immunity for this breach of contract claim by the state legislature pursuant to KRS Chapter 45A [the Kentucky Model Procurement Code]." However, based upon the requirement of KRS 45A.245 that actions brought pursuant to the Model Procurement Code "shall be brought in the Franklin Circuit Court," the Fayette Circuit Court also transferred the case to the Franklin Circuit Court.[4] Before the transfer could be completed, the University filed an interlocutory appeal from the order denying immunity as allowed by *Breathitt County Board of Education v. Prater*, 292 S.W.3d 883, 887 (Ky.2009).

In Miller's case, the University moved to dismiss on grounds of improper venue and sovereign immunity. The Fayette Circuit Court denied the motion and transferred the case to Franklin Circuit Court pursuant to KRS 45A.245. The Franklin Circuit Court denied the University's motion to dismiss Miller's claim on the grounds of sovereign immunity, though the basis for the decision is unclear. Again invoking *Prater*, the University appealed the rejection of its claim of sovereign immunity.

The Court of Appeals addressed the Furtula and Miller cases together and reversed both circuit court decisions. The court held that the documents establishing the University of Kentucky's employee disability compensation did not create an implied contract under *Parts Depot, Inc. v. Beiswenger*, 170 S.W.3d 354 (Ky.2005). Specifically, the Court of Appeals held that "none of the plan documents provided to this Court evidence [the] intent to create a contract on the part of the University."[5] The Court also noted that, unlike the relevant documents in *Parts Depot*, which used specific and unequivocal contractual language, rather than precatory language, the University documents cited by Furtula and Miller as the basis of their contract claim were replete with precatory language and express contractual disclaimers to the effect that the relevant documents specifically were *not* intended to form a contract. After noting that the University was a state agency entitled to sovereign immunity from suit absent a legislative waiver, the Court of Appeals held that even if the documents gave rise to an *implied* contract, the claims would not be allowed because the state's immunity was waived under KRS 45A.245 only for *written* contracts. And, while the Court of

---

4. Since we do not decide whether the immunity-waiver provision of KRS 45A.245 applies in the context of a contractual dispute between state universities and their employees, we also do not address the applicability of KRS 45A.245's assignment of venue; indeed, none of the parties raised arguments on that

point and the Court of Appeals made no mention of it.

5. In support of its decision the Court of Appeals cited various sections of the applicable documents that disclaimed the creation of contractual rights.

Appeals did not explicitly say so, implicit in its holding is the recognition that an implied contract is not a written contract.

We granted discretionary review to address whether the various documents in this case gave rise to a written contract that fits within the legislative waiver of sovereign immunity provided within the Model Procurement Code.

## II. FURTULA AND MILLER DO NOT HAVE AN IMPLIED CONTRACT FOR THE UNIVERSITY OF KENTUCKY'S EMPLOYEE DISABILITY COMPENSATION PLANS

Fundamental to our review of a contractual claim premised upon an employee handbook is our holding in *Parts Depot*, 170 S.W.3d at 354. In that case, we considered whether a contractual obligation could be. implied, thus vesting the employee with an equitable contract claim for the employer's failure to follow certain wage provisions contained in the employer's personnel policies. We held that "[o]nce an employer establishes an express personnel policy and the employee continues to work while the policy remains in effect, the policy is deemed an implied contract for so long as it remains in effect. If the employer unilaterally changes the policy, the terms of the implied contract are also thereby changed." *Id.* at 363.

Basic contract law provides that, as in the case of an express contract, an implied contract[6] requires the agreement of the promisor to be bound.[7]

[A] contract may be inferred wholly or partly from such conduct as justifies the promisee in understanding that the promisor intended to make a promise. *To constitute such a contract there must, of course, be a mutual assent by the parties—a meeting of minds—and also an intentional manifestation of such assent.* Such manifestation may consist wholly or partly of acts, other than written or spoken words.

*Kellum v. Browning's Adm'r*, 231 Ky. 308, 21 S.W.2d 459, 463 (1929) (emphasis added). Similarly, upon application of these principles in *Johnson's Adm'r v. Johnson*, 244 S.W.2d 969, 972 (Ky.1951) we stated:

The conditions and circumstances were not such as . . . show a mutual intention to contract. There is no disclosure of facts from which it may be inferred there was a meeting of minds or an

---

**6.** By definition, "[a]n implied contract is one neither oral nor written—but rather, implied in fact, based on the parties' actions." *Hammond v. Heritage Communications, Inc.*, 756 S.W.2d 152, 154 (Ky.App.1988). In the case of an implied contract "some one or more of the terms and conditions are to be implied from the circumstances or conduct of the parties." *Dorton v. Ashland Oil & Ref. Co.*, 303 Ky. 279, 197 S.W.2d 274, 275–76 (1946); *In re Penn. Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir.1987) ("An implied-in-fact contract, therefore, is a true contract arising from mutual agreement and intent to promise, but in circumstances in which the agreement and promise have not been verbally expressed. The agreement is rather inferred from the conduct of the parties."); *Saint Barnabas Med. Ctr. v. Essex County*, 111 N.J. 67, 543 A.2d 34, 39 (1988) ("[A] true contract implied

in fact 'is in legal effect an express contract,' and varies from the latter only insofar as the parties' agreement and assent thereto have been manifested by conduct instead of words." (citation omitted)); *Watts v. Columbia Artists Management Inc.*, 188 A.D.2d 799, 801, 591 N.Y.S.2d 234 (N.Y.A.D.1992) ("A contract implied in fact rests upon the conduct of the parties and not their verbal or written words. Thus, the theories of express contract and of contract implied in fact are mutually exclusive." (citation omitted)); accord Restatement (Second) of Contracts § 4 comment a.

**7.** See *Cuppy v. Gen. Acc. Fire & Life Assur. Corp.*, 378 S.W.2d 629, 632 (Ky.1964) ("Every contract requires mutual assent and consideration[.]").

expectation that one party would receive payment for the services rendered and the other would pay for services accepted. This is what we call a contract implied in fact.

With respect to conduct as a manifestation of contractual intent, the Restatement (Second) of Contracts § 19(2) (1981) provides: "The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." Likewise, the Restatement (Second) of Contracts § 26 reflects the conventional contract principle that "[a] manifestation of willingness to enter into a bargain *is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.*" (emphasis added).

█ In other words, when the recipient of a statement is informed that the maker of the statement does not intend to enter into a contract, as occurred in this case with the University's clear statement that the handbook was not a contract, the formation of a contract will not be implied.

█ The University of Kentucky's Staff Handbook, one of the documents relied upon by Appellants Furtula and Miller as essential to the contract they allege was formed in connection with their employment, includes this disclaimer, in all capital letters: "THIS HANDBOOK IS NOT A CONTRACT. THE EMPLOYEES OF THE UNIVERSITY ARE 'AT WILL' EMPLOYEES AND ARE SUBJECT TO LAY–OFF OR TERMINATION IN ACCORDANCE WITH UNIVERSITY POLICIES AND PROCEDURES."

Specific human resource policies of the University of Kentucky pertaining to the long-term disability program[8] state that "[t]he University reserves the absolute right ... to modify or change, and to abolish or consolidate any of these programs and plans, or any portion thereof, as deemed appropriate and in the best interests of the University and its employees." Section 8.01 of the long-term disability plan includes a "General Disclaimer" that neither the establishment of the trust, its funding, "nor the payment of any benefits shall be construed as giving any Participant or other person any legal or equitable right against the Employer, or any officer or employee thereof, or the Trustee, except as herein provided." It also provides that "[u]nder no circumstances shall the terms of employment of any Participant be modified or in any way affected hereby." Plan documents specifically state that nothing in it "shall be construed as a contract of employment between the [University] and any Employee[.]"

Such clear and unequivocal disclaimers of contractual intent along with express reservations of the authority to alter and amend the disability policies *at any time*[9] make it obvious to employees and prospective employees that the University of Kentucky did not intend, through these documents, to form a contract binding itself to the long term disability and salary continuation programs. This clear and convincing evidence negating the existence of contractual assent, and clearly communicating that intent to prospective and current em-

8. Human Resource Policies & Procedures 90.0.

9. For example, § 7.01 and § 7.02 of the Salary Continuation Plan allow the university president "to amend in whole or in part any or all of the provisions of [the] Salary Continuation Plan" and confer the Board of Trustees with the right to terminate the plan at any time.

ployees, precludes us from inferring the existence of an implied contract.

Significantly, in our conclusion in *Parts Depot* that an implied contract did indeed arise from the employer's personnel handbooks and documents, we specifically rejected the employer's reliance upon countervailing cases for the very reason that those cases involved employee handbooks or personnel policies, like the University of Kentucky's, that contained either precatory language or explicit disclaimers of an intention to be contractually bound. *Id.* at 362–63.

That absence of a contract disclaimer in the personnel policies in *Parts Depot* was a key underpinning for our holding that an implied contract *can* arise out of an employee handbook; accordingly, because the employee handbook at issue in this case contained a contract disclaimer, *Parts Depot* is easily distinguishable. Consequently, in light of the unambiguous and explicit disclaimers contained in the relevant University of Kentucky disability benefit documents, we are compelled to conclude that Appellants Furtula and Miller did not have an enforceable contractual claim for benefits under the University of Kentucky's employee long-term disability compensation plans.

## III. CONCLUSION

Because Appellants have not established that the General Assembly expressly waived sovereign immunity in claims based upon implied contracts arising from a state university's employee handbooks and personnel policies, and because the relevant University of Kentucky personnel documents specifically disclaimed the creation of a contract, we conclude that sovereign immunity remains to be a valid affirmative defense under the circumstances presented, and the trial court therefore correctly awarded summary judgment regarding Appellants' contract claims against the University. Therefore, we affirm the decision of the Court of Appeals.

CUNNINGHAM and KELLER, JJ., concur. MINTON, C.J., agrees with Justice NOBLE's dissent to the extent that employee handbooks and other documents can be a written unilateral contract sufficient to meet the requirements of KRS 45A.245 but joins the Court's result because the handbook disclaimers and language in other documents reserving the University's right to discontinue the disability-benefits programs show a lack of intent to be bound, which bars the formation of a unilateral contract in this case. NOBLE, J., dissents by separate opinion in which SCOTT, J., joins. ABRAMSON, J., not sitting.

NOBLE, J., Dissenting:

A majority of this Court, with Chief Justice Minton's separate concurrence, has concluded that Vera Furtula and Anthony Miller did not have lawfully authorized written contracts with their employer, the University of Kentucky, and that their claims are therefore not covered by the sovereign immunity waiver in KRS 45A.245 regardless of its applicability to state universities. I cannot join either conclusion, and therefore I dissent.

The majority concludes there were no contracts at all. To reach this conclusion, the majority focuses on disclaimers in the employee handbook and other documents such as the Salary Continuation Plan and Long–Term Disability Plan, stating they are not contracts of employment. In so doing, however, they are reading the disclaimers out of context. While I agree that the disclaimers mean that the documents are not a contract of employment, i.e., one that changes the at-will nature of the employment, that does not mean the

documents do not give rise to other contractual rights.

The majority focuses on provisions in various documents reserving to the University the right to modify or abolish the benefit plans at any time and stating that the establishment of a trust and payment of benefits shall not give rise to rights to employees. This position also misreads these provisions, which state that they do not give rise to rights "except as ... provided" elsewhere in the documents. And they do provide rights elsewhere.

## I. Furtula and Miller have a written unilateral contract with the University.

There is no question that Furtula and Miller do not have a traditional written bilateral contract with the University of Kentucky. Instead they claim the various documents in this case constitute a contract under *Parts Depot, Inc. v. Beiswenger*, 170 S.W.3d 354 (Ky.2005). In that case, this Court held that an *express* personnel policy can give rise to contractual rights. *Id.* at 362–63. Specifically, the Court held that a personnel policy, which can include an employee handbook, "can become a binding contract 'once it is accepted by the employee through his continuing to work when he is not required to do so.' " *Id.* (quoting *Hoffman–La Roche, Inc. v. Campbell*, 512 So.2d 725, 733 (Ala. 1987)).

Such a contract, however, is not a traditional express contract. As this Court noted, the "principle is akin to estoppel," and thus "[o]nce an employer establishes an express personnel policy and the employee continues to work while the policy remains in effect, the policy is deemed an implied contract for so long as it remains in effect." *Id.* at 363.

Thus the exact nature of such an agreement—such as whether it is written—is largely irrelevant in the private context. Absent an objection based on the statute of frauds, the agreement, whatever its form, is enforceable against a private employer.[1] Consequently, *Parts Depot* simply does not discuss the importance of a writing because that fact was not dispositive in that case. Thus to read *Parts Depot* to say that there was not a writing in that case is simply reading something into the case that is not there. A better reading is that the Court did not need to address whether there was a proper writing because there was *at least* an implied contract. However, whether the contract is *written* matters substantially in the governmental sector because, at least in Kentucky, sovereign immunity is waived only for written contracts. *See* KRS 45A.245. And unlike in *Parts Depot*, the existence of a contractual writing is very much at issue in this case.

No doubt, there is a writing in this case. Indeed, there are multiple writings that appear to give express rights to the University of Kentucky's employees.

The problem here is the insistence that there can only be an *implied contract* under the facts of this case, which cannot be a "written" contract. At present, "[a]n implied contract is one neither oral *nor* written—but rather, implied in fact, based on the parties' actions." *Hammond v. Heritage Communications, Inc.*, 756 S.W.2d 152, 154 (Ky.App.1988) (emphasis added). Indeed, that is all the Court considered in *Parts Depot*. But whether there is a written contract has been made an issue in this case, and the facts show that there is a writing—actually more than one. If there is a writing expressing the

---

**1.** My conclusion is not intended to obviate the effect of the statute of frauds. I express no opinion as to whether that law might bar enforceability of a contract under *Parts Depot*.

terms of offer and acceptance, then this Court must look to that writing to determine whether there is a binding contract, because a central issue of this case—the requirement of *written contracts with the state*—takes this case a step beyond *Parts Depot*.

I depart from the majority, not because I would find that you can have an implied written agreement, but because I believe that *Parts Depot* was tied to its issues, and thus does not directly apply to contracts with the state which must be in writing. The Court in *Parts Depot* was imprecise in concluding that the agreement at issue in an employee-handbook case is only an *implied* contract question.

After further review of the law on the subject, it appears that while the agreement in such a case may be an implied contract, it certainly is a *unilateral* contract. In fact, the Court said as much in *Parts Depot*:

> We conclude that a promise of job security contained in an employee handbook distributed by an employer to its employees constitutes an offer for a *unilateral contract*; and an employee's continuing to work, while under no obligation to do so, constitutes an acceptance and sufficient consideration to make the employer's promise binding and enforceable.

*Parts Depot*, 170 S.W.3d at 362–63 (quoting *Cook v. Heck's Inc.*, 176 W.Va. 368, 342 S.E.2d 453, 459 (1986)) (emphasis added).

The focus in *Parts Depot* was on whether there was a binding agreement, not on the nature of the agreement. In this case, the handbook and other written documents created a written unilateral contract, the terms of which were written by the University inviting performance by the employees.

Indeed, this is likely the better take on employee-handbook cases generally. The agreements in such cases, if they in fact exist, are not pure implied contracts because of the manner in which they are proved. "[A] 'contract implied in fact' . . . differs from an 'express contract' only in the *mode of proof required; and it is implied only in that it is to be inferred from the circumstances, the conduct, and the acts or relations of the parties, rather than from their spoken words*." *Victor's Ex'r v. Monson*, 283 S.W.2d 175, 176–77 (Ky.1955).[2] It is telling that a writing is not included in the modes of proof from which an implied contract can be shown.

Nevertheless, *Parts Depot* relied on a substantial writing issued by one party to another describing rights and obligations to find an implied contract. It is highly unusual to find an implied contract in such circumstances, as an implied contract is neither oral nor written, *Hammond*, 756 S.W.2d at 154, nor is it proven by the parties' words, *Victor's Ex'r*, 283 S.W.2d at 176–77.

The better understanding is that such a writing is a unilateral contract accepted by performance. "Unilateral contracts have long been recognized by the law." *Jackson v. Pepper Gasoline Co.*, 280 Ky. 226, 133 S.W.2d 91, 93 (1939). Such a contract "is defined as 'one in which no promissor [sic] receives a promise as consideration for his promise.'" *Id.* (quoting Restatement of Contracts § 12). A unilateral contract is promise on one side accepted by performance on the other, with the performance, rather than a sec-

---

**2.** A contract implied in fact is an actual agreement and differs from a contract implied at law, which is an equitable remedy, also known as quasi-contract, frequently used to avoid unjust enrichment. *Kellum v. Browning's Adm'r*, 231 Ky. 308, 21 S.W.2d 459, 465 (1929).

ond promise, being the consideration in return for the first promise. *See* 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.4, at 205 (3d ed. 2004) ("In forming a unilateral contract only one party makes a promise: the offeror makes the promise contained in the offer, and the offeree renders some performance as acceptance."). "It is the offeree's acceptance that furnishes consideration for the promise embodied in the offer.... If ... the offeror sought as consideration some performance, the result will be a unilateral contract." *Id.* § 3.12, at 265–66; *see also City of Houston v. Williams,* 353 S.W.3d 128, 135–36 (Tex.2011) ("[A] unilateral contract is created when a promisor promises a benefit if a promisee performs. The requirement of mutuality is not met by an exchange of promises; rather, the valuable consideration contemplated in exchange for the promise is something other than a promise, i.e., performance. A unilateral contract becomes enforceable when the promisee performs. [A] unilateral contract occurs when there is only one promisor and the other accepts ... by actual performance, rather than by the usual mutual promises." (citations and quotation marks omitted, ellipsis in original)).

Employee-handbook cases are one of the few areas where unilateral contracts are likely to arise in modern law. Indeed, "[i]t is relatively rare for an offeror to seek acceptance by performance rather than by a promise." Farnsworth, *supra,* § 3.12, at 267. But "[p]articularly important are the handbook cases, in which an employee claims that an employer has, by distributing a handbook to employees, made an offer to modify the traditional at-will relationship and that the employee has accepted that offer by performing or continuing to perform." *Id.*

Here, the various documents contain provisions that invite performance. For example, if an employee works for a year, the employee becomes a participant in the Long–Term Disability (LTD) program, that is, becomes eligible for benefits. Thus, the documents promise to provide benefits upon the employee's performance, that is, working for at least one year. There is a writing, an offer, and acceptance by performance.

In this sense, the case is very much like *City of Houston v. Williams,* 353 S.W.3d 128, 131 (Tex.2011), which while not binding on this Court is instructive and persuasive. In *Williams,* a group of city firefighters sought to sue the city of Houston, claiming that a series of ordinances constituted a contract for benefits sufficient to meet Texas's statutory waiver of sovereign immunity. Like Kentucky, Texas requires a written contract before a waiver will be found. *Id.* at 134.

The Texas Supreme Court noted that ordinances are the means by which the city conducted its business. *Id.* at 136. It concluded that the ordinances, under a theory of unilateral contract, "comprise a contract, and that contract is in writing." *Id.* at 138.

The court explained that the city had manifested an intent to be bound or "to act in a specific way in the Ordinances by its extensive use of the word 'shall' and similar provisions that make the benefits offered to the Firefighters mandatory upon performance." *Id.* (footnote omitted). The court also explained that the ordinances were written by the city and were "addressed to a discrete group of offerees: those persons qualifying as 'eligible employees.'" *Id.* Based on these factors, the court concluded that "the Ordinances constitute[d] an offer that was communicated to the Firefighters, which the Firefighters

accepted by performing." *Id.* (citation omitted).

In this case, the University has manifested its intent to be bound by the frequent use of "shall" and "will" in the various handbooks, policies and procedures, and plan documents to state when the plan participants become eligible and what they will receive upon total disability. The documents also address a discrete group of offerees: eligible regular employees. At least one of the documents, the Staff Handbook, is given directly to employees, and the other documents are available on the University's website or referenced in the handbook or other documents. From this, I can conclude that the University communicated an offer to its employees, who accepted the offer by performing, i.e., working for the University.

*Williams* also noted that the ordinances prescribed what was required of performance, namely services for the city. *Id.* In this case, the University's documents also state what is required by the employees: they must work for the University (i.e., be employees) for one year, and must become totally disabled to get benefits.

*Williams* further stated that the contract was in writing and could be embodied in more than one document, i.e., the various ordinances in effect. Here, the contract is clearly in writing, albeit in more than one document—the University has issued the handbook, the human-resource policies and procedures, the two plan documents, and the trust agreement. All the terms of the purported agreement are laid out in the various documents, often repeatedly since many of the documents repeat provisions in identical or substantially the same language.

That the contract is accepted by performance does not mean it is not in writing. The performance is not the contract; the performance is merely the acceptance

of the contract. In a unilateral contract, the performance is the consideration (as opposed to a mutual promise). The performance is also the functional equivalent of the signature on a standard bilateral contract. But it is not the contract itself. Rather, all the provisions that Furtula and Miller seek to enforce against the University, or to base their claims upon, are in writing—in the University's various documents. That is enough for a *written* contract.

And *Williams* also noted that "the Ordinances state the essential terms of the agreement between the Firefighters and the City," and those terms included "compensation, duties or responsibilities," which were plainly included in the ordinances. *Id.* at 138–39. Here all the terms are laid out in the various documents.

Ordinarily, whether the contract was one implied in fact or a unilateral contract would not matter—the outcome of such cases is the same. A court would find the existence of an agreement binding the parties, which could allow for an action for breach or enforcement. But, as with the distinction between written and unwritten agreements, the difference between implied and unilateral contracts matters when dealing with a governmental agency. In Kentucky, the law allows actions for breach or enforcement only for certain kinds of contracts, specifically, lawfully authorized written contracts. KRS 45A.245. The particulars matter only in the governmental sphere, where, as in Kentucky, sovereign immunity bars claims on contracts unless the contracts are written. When the government is involved—as illustrated by this case—the particulars are paramount.

I agree with *Parts Depot* that an employee handbook—a written document—can be a unilateral contract. I conclude that like the Houston ordinances in *Williams,* the University's documents in

this case "collectively constitute a unilateral ... contract." *Williams,* 353 S.W.3d at 137; *see also* Farnsworth, *supra,* § 2.10a, at 11.112 ("If the handbook was given to the employee at the time the employee was hired, there would seem to be little difficulty in finding consideration on the ground that the employee's commencing work was bargained for in exchange for its promise. The result would be a unilateral contract...."). Like the city ordinances in *Williams,* written acts of the University's Board of Trustees and the University's policies and procedures are how it conducts business. Such writings are a unilateral contract that become binding upon an employee's performance.

Moreover, the documents "constitute [a] written contract[ ]." *Williams,* 353 S.W.3d at 131. There is no question that the handbook and other documents are in writing. This is sufficient to satisfy the requirement of a "written contract" under KRS 45A.245. As noted above, KRS 45A.245 encompasses *all* lawfully authorized written contracts. And the definition of "written" is very broad. *See* KRS 45A.030 (29) ("'Writing' or 'written' means letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation."). And unlike an implied written contract there is no contradiction in finding a written unilateral contract.

Thus, I would find that Furtula and Miller had written agreements with the University as contemplated by KRS 45A.245.

## II. The disclaimer and other language are ineffective at barring the creation of a unilateral contract for disability benefits.

As noted above, the majority concludes that various disclaimers in the documents are sufficient to avoid their being read as a contract at all under *Parts Depot.* I disagree and conclude that disclaimers are ineffective to bar a finding of a unilateral contract for benefits, even though the disclaimers may prevent the documents from altering the at-will nature of the employment.

The first disclaimer cited by the majority appears in the handbook. It states, in all capital letters: "THIS HANDBOOK IS NOT A CONTRACT. THE EMPLOYEES OF THE UNIVERSITY ARE 'AT WILL' EMPLOYEES AND ARE SUBJECT TO LAY–OFF OR TERMINATION IN ACCORDANCE WITH UNIVERSITY POLICIES AND PROCEDURES." The first sentence of this disclaimer must be read in the context of the entire disclaimer, which is clearly focused on maintaining at-will employment. At most, this disclaimer prevents the handbook from being a contract of employment with, for example, a term. It does not mean that the handbook cannot give rise to a contract for other things, such as long-term disability benefits. And even if the disclaimer is effective as to the handbook being a contract, it cannot be effective against the other documents (the human-resources policies, benefits-plan documents, and trust agreement), which are also sufficient to give rise to a contract for benefits.

The majority also cites Salary Continuation Plan § 8.01, which states that nothing in it "shall be construed as a contract of employment between the [University] and any Employee, or as any right of any Employee to be continued in the employment of the Employer, except as may be protected under the Age Discrimination in Employment Act Amendments of 1978." Again, this only goes to whether the at-will

nature of the employment was changed and is not inconsistent with the idea that the documents could be contracts for *other* things, such as disability benefits, once an employee has *vested* into those rights by performance.

If anything, the at-will disclaimers enforce the notion that the employees have a *unilateral* contract for various benefits. An employment contract would consist of mutual promises to be executed in the future. Any promise would be enforceable upon the exchange of those mutual promises. Thus, an employee under an employment contract agrees to work in the future for the employer, perhaps exclusively and with a non-compete provision, in exchange for job protection, such as terminable for cause instead of at will. The at-will disclaimers show there is no such exchange of mutual promises.

Under a unilateral-contract theory, the employer's promise is only enforceable upon performance by the employee. Such agreements are largely past-oriented, since they are enforceable only for past performance. It is thus telling that the University's disclaimers are only oriented toward the future, to disclaim any exchange of mutual employer-employee promises to be executed in the future.

Instead, the employee only gets what he or she earns by performance. If she works a certain number of hours, she only gets paid for those hours, and cannot claim she is entitled to wages or salary in the future (unless she works in the future). Similarly, if the employee works for the employer long enough to vest into disability benefits—one year, in this case—then the employee is vested into those benefits and earns a contractual right to them, assuming the employee can prove total disability. (Indeed, and sadly, becoming disabled is the ultimate "performance" of the unilateral contract, entitling an employee to monetary benefits, rather than the potential for benefits, under these documents.)

The majority also points to the various other provisions, such as Human Resources Policies & Procedures 90.0, stating that the university can alter, amend, or terminate the LTD program at any time. Such disclaimers are not effective as to a unilateral contract to the extent it has already been performed. While the University could do away with the benefits program in the future, it does not claim it could stop giving benefits to existing beneficiaries. Indeed, the trust agreement itself requires that the trust corpus be distributed to such existing beneficiaries upon termination of the program, and states that the funds may only be used for their benefit. (Thus, those employees who have engaged in the ultimate "performance"— becoming disabled—cannot lose their benefits, except under the majority's reading of these documents, which state that even those employees have no contract.)

In fact, the majority's own discussion of *Parts Depot* shows that this is an acceptable part of the employer-employee contract evinced by employee handbooks and similar documents, and that the power to alter the agreements going forward does not change the agreement that has already been accepted by past performance. As the majority quotes at the beginning of its discussion, "[o]nce an employer establishes an express personnel policy and the employee continues to work while the policy is in effect, the policy is deemed an implied contract for so long as it remains in effect." *Ante* at 308 (quoting *Parts Depot*, 170 S.W.3d at 363). This is so even though the employer can unilaterally change the policy at any time. If that happens, then "the terms of the implied contract are also thereby changed." *Id.* (My only quibble here is that "implied

contract" should read "unilateral contract" to more accurately reflect the legal relationship created by personnel policies and the like.) But the change is only forward going. Any benefits that have already been earned by performance cannot be taken away, as they are subject to a binding unilateral contract.

Again, this disclaimer presents a scenario like that in the Texas case, *Williams*. There, a provision in the ordinances stated that they did not "create a vested right of compensation for sick leave benefits or, where applicable, for termination payments." *City of Houston v. Williams*, 353 S.W.3d 128, 140 (Tex.2011). The court concluded that the disclaimer was ineffective as to benefits already earned by the firemen's performance. Specifically, the court distinguished this disclaimer from those disclaiming the creation of an employment or tenure contract. *Id.* It went on to state: "Disclaiming a vested right to compensation is not equivalent to a disclaimer of contractual intent—to the contrary, an employee may have a valid employment contract, promising that benefits will accrue upon performance, but those benefits will not vest until the employee actually performs." *Id.* The court concluded:

> The disclaimer amounts to a warning to City employees that the City can change the benefits over time—in other words, the offer that the City is making, as regards to sick leave benefits, is subject to change. At most, the disclaimer indicates that the promises contained in the

Ordinances remained illusory until the Firefighters performed.

*Id.* (footnote omitted).[3]

So too here, the provisions allowing amendment or termination of the LTD program were merely a warning to the University's employees that their benefits were subject to change. Upon performance, however, the illusory becomes real, and a contractual obligation is thus born out of acceptance by the employee's performance.

The majority concludes that nothing in this record shows a mutual intent to enter into a contract, and certainly no intent on the part of the University. That is far from the case. All of the basic elements of a contract—offer, acceptance, and consideration—are present here. What is conceptually difficult about this case is that it does not present a standard bilateral contract signed by both parties. Instead, it presents a set of writings evincing a unilateral contract for benefits, which employees accept by performance, that is, by working and eventually by becoming disabled.

### III. KRS 45A.245, as a part of the Kentucky Model Procurement Code, applies in the context of state university employee relationships.

Having concluded that each of the employees had a written unilateral contract with the University, I must, unlike the majority, determine whether the waiver of sovereign immunity contained in KRS 45A.245 applies to the employees' contracts. I conclude that it does.

---

**3.** The court also noted in a footnote that such a warning was unnecessary because "offerors generally have the power to revoke or modify offers until the offeree accepts or performs, assuming the revocation or modification is communicated to the offeree before any attempted acceptance." *City of Houston v. Williams*, 353 S.W.3d 128, 140 (Tex.2011). This is consistent with *Parts Depot*, which

noted that an employer could unilaterally alter the employee handbook or personnel policies and thereby change the terms of the contract. *Parts Depot, Inc. v. Beiswenger*, 170 S.W.3d 354, 363 (Ky.2005). This further shows that the contractual rights described in *Parts Depot* are better understood as arising under a unilateral contract, rather than an implied contract.

It almost goes without saying that contract claims against the state and its agencies are barred, by default, by sovereign immunity and related doctrines. *See Ammerman v. Board of Educ., of Nicholas County*, 30 S.W.3d 793, 797 (Ky.2000); *Foley Const. Co. v. Ward*, 375 S.W.2d 392, 396 (Ky.1963). For a person to sue the state on a contract, the state must first waive its immunity. The General Assembly has done so by enacting KRS 45A.245, which is presently included in the Model Procurement Code, KRS Chapter 45A.

It has been argued that state-university employees are not hired under the Code because their "contracts," though arguably for "services," cannot be, "contracts" as defined in the Code.[4] This argument arises out of a perceived conflict between KRS 45A.050, which states all authority under the Code is vested in the Finance and Administration Cabinet, and statutes giving the board of trustees of the University of Kentucky exclusive control over hiring employees. See KRS 164.220–.225. A proposed resolution to this conflict has been to find that any contracts of employment that a state university might have with its employees are not contracts under the Code, and are thus not "contracts" governed by the Code in any way, including the waiver of sovereign immunity that would allow suit for breach of those contracts. I cannot agree.

I would resolve the conflict in another way. I agree that there is an apparent conflict, which requires us to engage in statutory construction to harmonize the statutes. *See Light v. City of Louisville*, 248 S.W.3d 559, 563 (Ky.2008). But to the extent possible, we are to "resolve the conflict between the two statutes so as to give effect to both." *Id.*

We can resolve the conflict without reading the entire Code as inapplicable to state-university contracts by applying the "general/specific canon"[5] to harmonize the conflicting statutes. Under this canon, "the more specific statute controls over the more general statute." *Id.* Thus, to the extent that a general provision of the Code transfers authority to the Cabinet or prescribes a specific method of awarding contracts, the more specific statutes giving exclusive control over employment questions to the board of trustees should control.

But that does not mean that other provisions of the Code that are not in conflict with the university-specific statutes should not apply, nor does it require us to conclude that the University's agreement with its employees are not contracts. To the extent possible, the general provisions should be applied. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 184 (2012) ("Note that the general/specific canon does not mean that the existence of a contradictory specific provision voids the general provision. Only its application to cases covered by the specific provision is sus-

---

**4.** " 'Contract' means all types of state agreements, including grants and orders, for the purchase or disposal of supplies, services, construction, or any other item. It includes awards; contracts of a fixed-price, cost, cost-plus-a-fixed-fee, or incentive type; contracts providing for the issuance of job or task orders; leases; letter contracts; purchase orders; and insurance contracts except as provided in KRS 45A.022. It includes supplemental agreements with respect to any of the foregoing...." KRS 45A.030(7).

**5.** "The general/specific canon, like the irreconcilability canon ..., deals with what to do when conflicting provisions simply cannot be reconciled—when the attribution of no permissible meaning can eliminate the conflict.... Under this canon, the specific provision is treated as an exception to the general rule." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012).

pended; it continues to govern in all other cases.").

There is no conflict between the definition of "contract" and the waiver of sovereign immunity for contract actions in KRS 45A.245, on the one hand, and the statutes controlling state universities and allocating power to their boards of trustees on the other. (In fact, any statute purporting to allow a board of trustees to decide whether its immunity should be waived is likely unconstitutional, since the power of waiver is granted explicitly to the General Assembly. *See* Ky. Const. § 231.) Thus, while the University is not subject to many provisions of the Code when it comes to hiring employees, it is subject to any other provision of the Code that does not create a conflict.

To do more than that is to move beyond harmonizing conflicting statutes to brutalizing an entire statutory scheme because of the conflict. There is a better way to resolve the conflict, one that leaves intact as much of the Code as possible. Applying the general/specific canon of construction does that. I would thus conclude that the University should be subject to KRS 45A.245. Its immunity for written contract actions has been waived.

This harmonizing of the statutes comports with the language of the waiver provision itself, which states: "*Any* person, firm or corporation, having a *lawfully authorized written contract* with the Commonwealth ..., may bring an action against the Commonwealth on the contract, including but not limited to actions either for breach of contracts or for enforcement of contracts or for both." KRS

45A.245(1) (emphasis added). The waiver is not limited to contracts entered into under the Code; rather, the waiver applies to all lawfully authorized written contracts. This necessarily includes contracts whose authority lies outside the Code.

That this is the correct interpretation is further shown by the fact that the state's waiver of immunity for contract actions pre-existed the Code. The waiver provision was first enacted in 1966, *see* 1966 Ky. Acts. Ch. 180, § 2, in response to *Foley Construction Co. v. Ward,* 375 S.W.2d 392 (Ky.1963), which held that sovereign immunity barred contract claims against the Commonwealth. *See Goss v. Sparta Stockyards, Inc.,* 481 S.W.2d 39, 40 (Ky. 1972). The Code was not enacted until 1978 and went into effect in 1979. *See* 1978 Ky. Acts ch. 110. Prior to that, the waiver language was included in substantially the same form in KRS Chapter 44, see KRS 44.270 (1966); 1966 Ky. Acts. Ch. 180, § 2, and eventually the same form, see KRS 44.270 (1976); 1976 Ky. Acts ch. 297, § 1.[6] The statute, its definition section, KRS 44.260, and other provisions were repealed and reenacted when the Model Procurement Code was enacted, and they read the same today as they did in 1976.

However, it is important to note that KRS Chapter 44, where the waiver provision originally appeared, is titled "Claims upon the treasury" and lays out most of the legislation promulgated under Section 231 of the Kentucky Constitution,[7] including that related to the Board of Claims, which hears negligence claims against the Commonwealth. In fact, the contract-

---

**6.** The primary difference between the original 1966 version of the waiver and the ultimate 1976 version is that the original version required that claimants exhaust their administrative remedies before filing suit. *Compare* KRS 45.270(1) (1966), *with* KRS 45.270(1) (1976). The remedy provision, KRS

45.270(2) was also changed somewhat. That provision, however, is not at issue in this case. Regardless, the present remedy provision, KRS 45A.245(1) is identical to the 1976 version of KRS 45.270(2).

**7.** "The General Assembly may, by law, direct in what manner and in what courts suits may

claim waiver provision was referred to as the "Contract Claims Act." *See Fidelity & Cas. Co. of New York v. Commonwealth ex rel. Christen,* 445 S.W.2d 113 (Ky.1969); *Kovachevich v. Univ. of Louisville,* 597 S.W.2d 621, 622 (Ky.App.1980).

And, as interpreted at that time, the provision applied to employment contracts, including those with the University of Louisville. *See Univ. of Louisville v. Martin,* 574 S.W.2d 676, 679 (Ky.App. 1978) (holding that action on alleged employment contract should have been brought in Franklin Circuit Court, as required by the waiver statute). Interestingly, the alleged contract in *Martin* was an earlier form of the Redbook, which is at issue in the present case against the University of Louisville. And, since the Model Procurement Code did not exist, the Act must have applied to non-Code contracts.

If the waiver provision applied to such agreements before 1978, then it must also have done so afterward, up to and including today. The waiver language was not changed in any way when it was repealed and reenacted, and it has not been amended since then. Nothing in the move from Chapter 45 to the newly created Chapter 45A suggests that the language was from that point forward intended to mean something else, as the majority suggests.

Indeed, the fact that the Contract Claims Act was reenacted in an identical form suggests the opposite: that the General Assembly intended the meaning to be the same, that is, to continue the waiver for all lawfully entered contracts with the Commonwealth. *Cf. Hughes v. Commonwealth,* 87 S.W.3d 850, 855 (Ky.2002) ("[T]he failure of the legislature to change a known judicial interpretation of a statute

[is] extremely persuasive evidence of the true legislative intent. There is a strong implication that the legislature agrees with a prior court interpretation when it does not amend the statute interpreted." (quoting *Rye v. Weasel,* 934 S.W.2d 257, 262 (Ky.1996)) (second alteration in original)).[8]

The General Assembly has had ample opportunity to change the contract-waiver provision since 1978, and it has not done so. It has never taken any step to limit the scope of the waiver first enacted in 1966. That waiver applied to all lawfully written contracts with the Commonwealth when enacted in 1966, and it still does today.

The waiver of sovereign immunity in KRS 45A.245, therefore, must apply to the contracts at issue in this case.

## IV. Conclusion

I would conclude that KRS 45A.245 applies to the University's contracts with its employees, allowing those employees to sue in court for enforcement or breach of the contracts. I would also conclude that the employees have written unilateral contracts with the University, containing sufficiently clear offers that they accepted by working for the University. Both Furtula and Miller worked long enough to vest into their benefits programs, and both alleged that they have become sufficiently disabled to qualify for payment under the benefits plans. They should be allowed to bring their claims under KRS 45A.245.

SCOTT, J., joins.

---

be brought against the Commonwealth." Ky. Const. § 231.

8. This canon of interpretation is sometimes called the "reenactment doctrine." *Common-*

*wealth v. Morris,* 142 S.W.3d 654, 661 (Ky. 2004). It is also known as the "prior-construction canon." *See* Scalia & Garner, *supra,* at 322.