NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0592n.06

Nos. 15-5563/5606

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 02, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JAMES W. HACKNEY, | ) | |
| | ) | |
| Plaintiff-Appellant/Cross-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| LINCOLN NATIONAL FIRE INSURANCE | ) | UNITED STATES DISTRICT |
| COMPANY, | ) | COURT FOR THE |
| | ) | WESTERN DISTRICT OF |
| Defendant-Appellee, | ) | KENTUCKY |
| | ) | |
| VASCULAR SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant-Appellee/Cross-Appellant. | ) | |

BEFORE: SILER, GIBBONS, and KETHLEDGE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** In the spring of 2011, James Hackney was terminated from his position with Vascular Solutions, Inc. ("VSI") following his failure to return from a nearly seven-month medical leave. Hackney maintains that he did not return to VSI because his hypoparathyroidism rendered him totally disabled. VSI, on the other hand, considered Hackney's failure to return "job abandonment" and refused to pay him severance, per the terms of Hackney's Employment Agreement (the "Agreement"). During his leave, Hackney applied for and was denied benefits under VSI's Salary Continuation Plan (the "Plan"), which was administered by Lincoln National Life Insurance Company ("Lincoln").

Hackney brings a host of claims arising from these two denials. He claims that VSI breached the Agreement, the Plan, and its duty of good faith and fair dealing under both, and he

claims that VSI owes him unpaid wages pursuant to Ky. Rev. Stat. § 337.385. Hackney also claims that Lincoln tortiously interfered with his contractual relationship with VSI under the Plan, and he alleges that VSI and Lincoln both engaged in the unlicensed practice of medicine, in violation of Ky. Rev. Stat. § 311.560. The district court granted summary judgment to the defendants on all claims. For the reasons that follow, we reverse the district court's resolution of both breach of contract claims, as well as the breach of the duty of good faith and fair dealing claims. We affirm as to all other claims.

I.

VSI is a Minneapolis, Minnesota-based company that develops medical devices for coronary and peripheral vascular procedures. In June 2005, VSI hired Hackney, a Kentucky native and current Kentucky resident, as an Associate Account Manager. Over the next five years, Hackney received a series of promotions and pay raises, and in July 2010, he was named Director of Marketing—Catheters. In this position, his salary was $178,000 per year plus bonuses and stock.

Upon taking the Director of Marketing position, Hackney signed an Employment Agreement. The Agreement clarified that Hackney remained an "at-will" employee, and Section 8 provided that Hackney was entitled to severance pay in the event he was terminated for any reason other than for "Violating Conduct," which the Agreement defined to include "job abandonment." (DE 116-2, Agreement, Page ID 1501–08.) The Agreement also stated that Hackney was "entitled to participate in benefit plans, which may be established by the Board of Directors" but clarified that "[o]ther than as specified in this Agreement, [Hackney] shall not have any entitlement to any benefits." (*Id.* at 1502.)

Under the Agreement, Hackney was entitled to participate in VSI's Salary Continuation Plan, which provides six months of continued salary benefits to qualified employees who become "totally disabled." The Plan defines "totally disabled" as the inability of the covered person, due to sickness or injury, "to perform each of the main duties of [the covered person's] regular occupation." (DE 116-4, Plan, Page ID 1520.) The Plan also notes that participants will continue to receive benefits payments until, among other dates, "the date you are no longer disabled" or "the date you fail to furnish proof that you continue to be disabled." (*Id.* at 1516.) VSI paid all benefits under the Plan out of its general assets, and VSI retained all financial responsibility for payments under the plan;[1] employees did not pay premiums under the Plan, nor were any amounts deducted from their salaries. The Plan contained a disclaimer on the first page stating that "[n]either the benefit nor this policy is a contract of employment." (DE 116-4, Plan, Page ID 1514.)

On August 1, 2009, VSI and Lincoln entered into an Advice to Pay Agreement, wherein Lincoln agreed to "[r]eview and investigate all claims and provide advice to [VSI] as to whether a claimant is eligible for disability benefits based on the nature of the disability and the terms of the Plan." (DE 116-14, Advice to Pay Agreement, Page ID 1591–95.) The Advice to Pay Agreement specifies that Lincoln is "acting solely as a consultant and contractor of Plan Sponsor (VSI), not as an insurer or underwriter of the Plan." (*Id.* at 1594.) In return for its role, Lincoln was paid $1.75 per month per covered employee.

Throughout his five-year employment with VSI, Hackney suffered from hypoparathyroidism. On October 6, 2010, Hackney notified VSI, for the first time, of his disorder and notified his supervisor that he believed he was permanently and totally disabled.

---

[1] It is undisputed that, because VSI financed the Plan with its own general assets, the Plan qualified as a "payroll practice," which is exempted from the requirements of ERISA, pursuant to 29 C.F.R. § 2510.3-1(b)(2).

On October 11, 2010, he filed for Salary Continuation Benefits under the plan, citing his hypoparathyroidism and claiming an onset date of October 6, 2010. Hackney's application included an attending physician's statement from Dr. Paul Goodlett, who noted a disability onset date of October 6, 2010 and stated that Hackney's disability was permanent.

Based on its review of Hackney's claim, Lincoln recommended to VSI that it grant Hackney's claim through November 2, 2010, which VSI ultimately did. Lincoln sent Hackney a letter on October 14, 2010, notifying him of this determination. The letter also informed Hackney that he was required to submit medical evidence of his continuing disability to be considered for extended benefits under the Plan. The letter emphasized that "a note from your physician without any supporting medical evidence may not be sufficient to consider further benefits." (DE 108, Hackney Dep. Ex. 24, Page ID 1338.) At this time, VSI also placed Hackney on FMLA leave through December 28, 2010.

On November 3, 2010, Hackney did not return to work. Instead, he sought continued benefits under the Plan, via a November 6, 2010 email, which stated that Hackney's doctors "agree that [his] disability is permanent/life-long." (DE 108, Hackney Dep. Ex. 25, Page ID 1339.) In addition to the email, Hackney submitted various medical records, including various treatment notes, two radiology reports, and statements from two of his treating physicians, Dr. Goodlett and Dr. Larry Fineman. Both Dr. Goodlett and Dr. Fineman opined that Hackney was permanently disabled. After reviewing this claim,[2] Lincoln advised VSI to deny Hackney's claims because he was not "totally disabled." (DE 108, Hackney Dep. Ex. 26, Page ID 1340–41.) Lincoln sent Hackney a letter to this effect on November 10, 2010, explaining that VSI "ha[d] not received any other medical information that indicates a severity or complications that

---

[2] Lincoln employed two nurses, Ted Hartsock and Joyce Mumm, to review Hackney's claim, neither of whom were licensed to practice medicine in Kentucky. VSI and Lincoln do not dispute this. Rather they claim that Hartsock and Mumm were not engaged in the practice of medicine as it is defined in Ky. Rev. Stat. § 311.560(1).

would prevent [Hackney] from performing [his] occupation." (*Id.*) The letter further explained that Hackney's current course of treatment, "[m]edication management," was "considered conservative treatment" and that he would need to provide more proof of his total disability in the form of "treatment notes, test results and any other medical data from [his] physican(s)." (*Id.*)

On December 21 and 28, 2010, and January 17, 2011, VSI sent letters asking Hackney when he planned to return to work. On January 18, 2011, three weeks after Hackney's FMLA leave expired, Hackney responded through counsel and requested additional leave. After negotiations, VSI agreed to hold Hackney's position open until April 20, 2011.

On January 28, 2011, Hackney's personal insurer, Northwestern Mutual, found him totally and permanently disabled and approved his claim for disability benefits. It does not appear that this determination was submitted to VSI or Lincoln in support of Hackney's claim for benefits. More than a year and a half later, on October 3, 2012, the Social Security Administration also found that Hackney was totally and permanently disabled, as of October 2010, and granted him Social Security Disability Insurance ("SSDI") benefits.

Dr. Goodlett submitted another letter to VSI on February 21, 2011, noting that Hackney's "condition has not changed" and notifying VSI that Hackney was not cleared to return to work. (DE 116-5, Goodlett, Page ID 1531; *see also* DE 108, Hackney Dep. Exhibit 38, Page ID 1356.) And on March 2, 2011, Hackney, through counsel, appealed the denial of his Salary Continuation benefits. Again, Lincoln advised VSI to deny the claim, and VSI ultimately denied Hackney's appeal. In a March 31, 2011 letter, Lincoln informed Hackney of the denial. The letter explained that "[w]hile the medical documentation indicates a diagnosis of hypoparathyroidism it appears [Hackney's] condition remains stable with normal lab findings

and no change in his treatment plan." (DE 108, Hackney Dep. Ex. 37, Page ID 1356.) The letter further noted that "the medical documentation reviewed does not provide evidence of functional limitations for a sedentary occupation," and that "[i]t would appear that his restrictions would include prolonged standing, walking, climbing, pushing/pulling, bending and lifting" all of which "would not be necessary functions of Mr. Hackney's occupation." (*Id.* at 1356–57.)

In an April 4, 2011 letter, Hackney notified VSI that his doctor had not released him to return to work. The letter also noted that it "is unclear the extent of the [work] accommodations Mr. Hackney will require." (DE 108, Hackney Dep. Ex. 38, Page ID 1358.) On April 21, 2011, Hackney failed to report to work, and VSI sent him a letter explaining that it would terminate his employment effective May 12, 2011. The letter explained that it was deeming Hackney's failure to return to work "job abandonment" and that, therefore, Hackney would not be entitled to severance under the Agreement. The letter also noted that throughout the process, Hackney "declined to identify any accommodations that would" allow him to return to work. (DE 108, Hackney Dep. Ex. 39, Page ID 1359.) The letter also recognized that Hackney's April 4, 2011 letter explaining that his doctor had not released him to return to work was "consistent with [his] earlier assertion that [he is] unable to perform any work for VSI." (*Id.*)

On March 6, 2012, Hackney sued VSI and Lincoln in Jefferson County, Kentucky Circuit Court. The defendants timely removed the action to federal court, based on diversity jurisdiction. In his amended complaint, Hackney asserted state-law claims against VSI for breach of contract, breach of the implied covenant of good faith and fair dealing, and a violation of Kentucky wage and hour laws pursuant to Ky. Rev. Stat. § 337.385. Hackney also asserted claims against Lincoln for tortious interference, and against both VSI and Lincoln for the unlicensed practice of medicine in violation of Ky. Rev. Stat. § 311.560.

Lincoln and VSI both moved for summary judgment. On May 30, 2014, the district court granted VSI's motion. The court concluded that Hackney voluntarily abandoned his job and was not entitled to severance under the Agreement. It further found that the Plan constituted a contract, which VSI had not breached because Hackney failed to provide adequate documentation to support his claim for benefits. Because the court found no breach of the Agreement or the Plan, it also granted summary judgment on Hackney's breach of the implied duty of good faith and fair dealing claim. As for Hackney's statutory claims, the court found that VSI did not owe Hackney unpaid wages under Ky. Rev. Stat. § 337.385, because Hackney was exempt from the statute's coverage and the context and equities of Hackney's case did not require any deviation from the clear text of the statute. The court further found that VSI's use of out-of-state, unlicensed nurses to review Hackney's claim did not constitute the practice of medicine in violation of Ky. Rev. Stat. § 311.560.

A year after it granted VSI's motion, the district court granted summary judgment to Lincoln. It found that Lincoln could not be liable for tortious interference because there was no breach of the agreement and because Lincoln was acting as VSI's agent in reviewing claims. The court also repeated its conclusion that the nurses employed to review claims were not practicing medicine within the definition of § 311.560.

Hackney filed a timely notice of his intent to appeal both grants of summary judgment, and VSI and Lincoln filed a timely notice that they were cross-appealing the district court's conclusion that the Plan was a contract.

II.

We review a district court's grant of summary judgment *de novo*. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). Summary judgment is appropriate "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe all reasonable inferences in favor of the nonmoving party. *Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 818 (6th Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The central issue is whether the evidence—viewed in the light most favorable to the nonmoving party—presents a question of fact sufficient to require submission to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Martin Cty. Coal Corp. v. Universal Underwriters Ins. Co.*, 727 F.3d 589, 593 (6th Cir. 2013).

## III.

As an initial matter, we must determine the substantive law that applies to the claims in this case. It is well established that, in a diversity case, a federal court must apply the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). This rule extends to the forum state's law regarding choice of laws. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Because this action was brought in federal court in Kentucky, Kentucky's choice-of-law rules apply. *See Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002).

Section 11(c) of Hackney's Employment Agreement contains a choice-of-law provision, which specifies that Minnesota law "govern[s] the validity, interpretation, and effect of this Agreement." (DE 116-2, Agreement, Page ID 1506.) The question, then, is whether Kentucky law would recognize and honor this provision. In *Wallace Hardware Co. v. Abrams*, we contemplated this exact question. 223 F.3d 382, 393–95 (6th Cir. 2000). We predicted that Kentucky courts would apply § 187 of the Restatement (Second) of Conflicts of Law and would honor choice-of-law provisions unless "the chosen state has no substantial relationship to the

parties or the transaction" or "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest." *Id.* at 397. Our *Erie* guess, however, appears to have been in error.

In *Schnuerle v. Insight Communications Co.*, 376 S.W.3d 561 (Ky. 2012), the Kentucky Supreme Court applied the most-significant-relationship test and, despite the presence of a choice-of-law provision, ultimately determined that Kentucky law should apply notwithstanding the parties mutual acquiescence to New York law. *Id*. at 566–67. This was also despite § 188(2)'s reference back to § 187 should the contract contain a choice-of-law provision. Restatement (Second) of Conflicts § 188(2). While the Kentucky Supreme Court did not explicitly state that it would apply § 188 even where a contract contains a choice-of-law provision, it appears to have done precisely that in *Schnuerle*. The Kentucky Supreme Court did not mention § 187; rather, it applied the factors delineated in § 188(2) and weighed the relative interests of Kentucky and New York in the litigation. *Schnuerle*, 376 S.W.3d at 566–67. Thus, as several federal district court decisions have noted, *Wallace Hardware*'s assumption about the Kentucky Supreme Court's application of § 187 has now proven faulty. *See Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 707–10 (W.D. Ky. 2013) (noting that this court had predicted that Kentucky would apply § 187, but instead applying § 188's most-significant-relationship test "in accordance with *Schnuerle*"); *see also Hall Waterproofing Tech., LLC v. Volatile Free, Inc.*, No. 15-72-DLB-JGW, 2016 WL 3597639, at *4 & n.1 (E.D. Ky. June 27, 2016) (noting that "[r]ecent decisions by Kentucky's highest court . . . have affirmed the application of § 188's most-significant-relationship test, even where the parties have expressly agreed to have their contractual rights and duties governed by a particular state's laws") (quoting *Griffin*, 970 F.Supp.2d at 709). Accordingly, we must apply the most-significant-relationship

test of § 188(2) to determine whether Kentucky or Minnesota law applies to the breach of contract claims.

The most-significant-relationship test asks courts to consider: "[1] the place of contracting, [2] the place of negotiation of the contract, [3] the place of performance, [4] the location of the subject matter of the contract, and [5] the domicil, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflicts, § 188(2). The parties did not brief these issues because they reasonably believed that Minnesota law would apply, and thus many of the facts necessary to make this determination are not in the record. However, given that Hackney was to perform his obligations while living and working predominantly in Kentucky, it is likely that Kentucky's interest in its citizens' employment contracts—especially those which are to be performed within the commonwealth—is sufficient for its law to apply. In any event, the result here would be the same under either Kentucky's or Minnesota's law.

Next, we must determine the law to apply to the non-breach-of-contract claims. The parties agree that Kentucky law should apply to all non-contract claims in this case, and application of Kentucky's choice-of-law rules confirms their position is correct.

In tort cases, Kentucky applies the "significant contacts" test. *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972); *see also Adam v. J.B. Hunt Transp., Inc.*, 130 F.3d 219, 230–31 (6th Cir. 1997), *abrogated on other grounds by Ortiz v. Jordan*, 562 U.S. 180, 183–84 (2011), *as recognized in Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 544 (6th Cir. 2012). This test requires courts to apply Kentucky law "if there are significant contacts—not necessarily the most significant contacts—with Kentucky." *Foster*, 484 S.W.2d at 829; *see also Adam*, 130 F.3d at 230–31 (noting that "Kentucky courts have . . . applied Kentucky substantive law whenever

possible") (quoting *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983).

Kentucky has a strong preference for applying its own law, and we have noted previously this

"provincial tendency in Kentucky choice-of-law rules." *Asher v. Unarco Material Handling,*

*Inc.*, 737 F. Supp. 2d 662, 667 (E.D. Ky. 2010) (citing *Wallace Hardware*, 223 F.3d at 391).

Here, Kentucky certainly has significant contacts with the tort-based claim: Hackney is a

Kentucky resident who worked for VSI in Kentucky, and at least some of the allegedly tortious

conduct took place there. Further, because Kentucky law applies to both the contract-based and

the tort-based claims here, Kentucky law also governs the good-faith-and-fair-dealing claim—

regardless of whether that action sounds in contract or in tort.[3] Finally, Kentucky law governs

Hackney's Kentucky statutory claims as well.

IV.

A.

Hackney first claims that VSI breached his Employment Agreement when it failed to pay

him severance. Under Kentucky law, the aim of contract law is to discern and enforce the intent

of the contracting parties. *Cf. Richey v. Perry Arnold, Inc.*, 391 S.W.3d 705, 709–10 (Ky. 2012)

When the language in a contract is clear and unambiguous, the language's plain meaning

controls this inquiry. *Frear v. P.T.A. Indust., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). If a

contractual term is reasonably susceptible to different interpretations, however, it is considered

ambiguous, *Richey*, 391 S.W.3d at 709 (citing *Cent. Bank & Trust Co. v. Kincaid*, 617 S.W.2d

32, 33 (Ky. 1981), and ambiguous contract terms "will be construed against the drafter."

*McMullin v. McMullin*, 338 S.W.3d 315, 322 (Ky. Ct. App. 2011). Once a term is found

---

[3] Kentucky law does not clearly indicate whether good-faith-and-fair-dealing claims sound in contract or in tort. At least one district court case found that it sounds in tort only when there is a "special relationship" between the parties—*i.e.*, the insurer-insured context. *See James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F.Supp.2d 807, 815–16 (E.D. Ky. 2013). Absent such a special relationship, it seems that a breach of the covenant of good faith and fair dealing sounds only in contract. *Id*. at 816. Either way, Kentucky law applies here.

ambiguous, courts may then resort to extrinsic evidence to help illuminate the parties' intentions. *Richey*, 391 S.W.3d at 709–10.

Under the Employment Agreement, VSI employees who are "[t]erminated . . . for any reason other than for Violating Conduct" are eligible to receive six months of severance pay. (DE 116-2, Agreement, Page ID 1506.) The Agreement defines "violating conduct" as "falsely reporting factual information to management, *job abandonment*, or refusal to follow specific direction from management." (*Id.* at 1507 (emphasis added).) VSI claims that Hackney voluntarily abandoned his job on April 21, 2011, when he failed to show up for work after being told that VSI would no longer hold his position open for him. The district court concluded that "job abandonment" was unambiguous. It noted that the plain and ordinary meaning of "abandon" is "to give up" or "to withdraw from." (DE 123, Op., Page ID 1821.) Based on this meaning, the court found that "job abandonment" connotes an intentional act, and it concluded that Hackney voluntarily abandoned his job. (*Id.* at 1821–22.)

Contrary to the district court's conclusion, the term "job abandonment" is ambiguous. The contract does not define the term, and this lack of specificity is problematic because of the term's multiple reasonable meanings. *See Aetna Cas. & Sur. Co. v. Kentucky*, 179 S.W.3d 830, 836–37 (Ky. 2005). In *Aetna*, the Kentucky Supreme Court found that the term "suit" was ambiguous because it was undefined in the parties' contract, and that it was unclear what types of actions constituted a "suit." *Id.* Likewise, "job abandonment" may mean a great number of things, and without a precise, or for that matter general, definition, it is impossible to tell what kind of behavior the parties intended to include. Hackney's situation is not a typical case of job abandonment. He did not walk off the job, nor did he fail to inform VSI why he would not be returning to work. True, in one sense Hackney chose not to return, but this decision was

informed by his doctors' recommendations that he was not fit to work, and it was made in the context of a disability determination by his personal insurer.[4] It is unclear whether VSI intended "job abandonment" to include situations like Hackney's, where an employee with a good-faith, medically informed basis for believing he is no longer physically able to work decides not to return from sick leave. VSI should not be able to utilize this ambiguity post hoc to deny Hackney benefits under the Agreement.

Under Kentucky law, the usual rule is that ambiguous terms are construed against the drafter. *See McMullin*, 338 S.W.3d at 322 (noting that the rule of *contra proferentem*—the maxim of contract interpretation that ambiguities will be construed against the drafter of the contract when the contract is susceptible to two meanings—has "long been followed in the Commonwealth" (citing *B. Perini & Sons v. S. Ry. Co.*, 239 S.W.2d 964, 966 (Ky. 1951))). Where contractual language is ambiguous, "'the court will gather, if possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written,' by evaluating extrinsic evidence as to the parties' intentions." *Frear*, 103 S.W.3d at 106 (quoting *Whitlow v. Whitlow*, 267 S.W.2d 739, 740 (Ky. 1954) and also citing *Teague v. Reid*, 340 S.W.2d 235, 242 (Ky. 1960)). And while Kentucky courts hold that "interpretation of contracts is an issue of law for the court to decide," they do so while noting that "if [a] writing is ambiguous, the factual question of what the parties intended is for the jury to decide." *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006). These two precepts are in tension. It is unclear whether Kentucky law contemplates entering judgment against the drafter of an ambiguous contract as a matter of law or if, because "job abandonment" is ambiguous, the

---

[4] In addition to letters from his treating physicians, Hackney also submitted a sworn declaration that "had [he] been able to return to work" he "would have done so immediately." (DE 116-3, Hackney Decl., Page ID 1509.)

meaning of the term is now a question for the fact-finder, who should construe it with the aid of extrinsic evidence of the parties' intent. In light of this uncertainty, and in an abundance of caution, we conclude that "job abandonment" is ambiguous as a matter of law, and remand the case so that the parties may present extrinsic evidence of their intent to the district court, if such evidence exists.

B.

Next, Hackney claims that VSI breached its duty to pay him benefits under the Salary Continuation Plan. He claims that he submitted sufficient evidence showing that he was "totally disabled" and is, therefore, owed continued salary benefits under the plain terms of the Plan. VSI cross-appeals, claiming that the Salary Continuation Plan is not a contract. VSI argues that there was no consideration, no mutual assent, and that, at most, the Plan constitutes an illusory promise.

As an initial matter, Hackney questions this court's jurisdiction to hear VSI's cross-appeal. This court has previously held that it is "well settled" that a "prevailing party cannot appeal an unfavorable aspect of a decision in its favor." *ASARCO, Inc. v. Sec'y of Labor*, 206 F.3d 720, 722 (6th Cir. 2000). Hackney argues that because the district court granted VSI's motion for summary judgment, VSI cannot appeal portions of the disposition with which it is unhappy. However, the general rule stated in *ASARCO*, like many general rules, has numerous exceptions.

In *Deposit Guaranty National Bank of Jackson v. Roper*, the Supreme Court explained that "[f]ederal appellate jurisdiction is limited by the appellant's personal stake in the appeal." 445 U.S. 326, 336 (1980). The Court went on to clarify that a party's concern that its "success in . . . future litigation would be impaired by *stare decisis* or collateral-estoppel application of the

District Court's ruling" qualified as a sufficient "stake in the appeal" to vest the Court with appellate jurisdiction. *Id.* at 337 (citing *Elec. Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241 (1939)). VSI's cross-appeal is on all-fours with *Electrical Fittings*, as explained by *Deposit Guaranty*. Although the district court's conclusion that the Plan was a contract "was immaterial to the [ultimate] disposition" of Hackney's claim, *Elec. Fittings*, 307 U.S. at 242, VSI is entitled to appeal this portion of the decision because the district court's determination that the Plan constitutes a contract could have collateral estoppel effects in future litigation. The potentially adverse preclusive effects of the district court's legal conclusion give VSI a sufficient "stake in the appeal" to vest this court with jurisdiction to hear VSI's cross-appeal. *Deposit Guaranty*, 445 U.S. at 336–37.

In support of its argument that the Plan is not a contract, VSI cites several cases for the proposition that a short-term disability plan that is not funded by employee contributions does not qualify as a contract because the employees give no consideration for plan benefits. (*See* Appellee Br. at 38–39 (citing *Cooper v. Broadspire Servs., Inc.*, No. Civ. A. 04-5298, 2005 WL 1712390, at *3 (E.D. Pa. July 20, 2005); *Langley v. DaimlerChrysler Corp.*, 407 F. Supp. 2d 897, 917–18 (N.D. Ohio 2005) *aff'd*, 502 F.3d 475 (6th Cir. 2007); *Diehl v. Elec. Data Sys. Corp.*, No 1:07-CV-1213, 2008 WL 2705540, at *3–4 (M.D. Penn. July 10, 2008)).) On the strength of these cases, VSI argues that because Hackney did not pay premiums under the Plan nor was money deducted from his salary, he has provided no consideration for the continuing salary benefits under the Plan.

The district court correctly rejected this argument, reasoning that Hackney's continued employment constituted consideration for the promises contained in the Plan. "Once an employer establishes an express personnel policy and the employee continues to work while

the policy remains in effect, the policy is deemed an implied contract for so long as it remains in effect." *Parts Depot, Inc. v. Beiswenger*, 170 S.W.3d 354, 363 (Ky. 2005). But, under Kentucky law, a "clear and unequivocal disclaimer[] of contractual intent along with express reservations of the authority to alter and amend" may prevent the finding of an offer on the part of the employer. *See Furtula v. Univ. of Ky.*, 438 S.W.3d 303, 309–310 (Ky. 2014) (with a majority of the court agreeing that express disclaimers and language permitting unilateral alteration of the employee handbook precluded formation of a contract because it evinced the employer's lack of intent to be bound). In *Furtula*, the Kentucky Supreme Court examined whether a University of Kentucky employee handbook created a contractual right to long-term disability and salary-continuation benefits. It found that the particular handbook in that case did not, relying on express disclaimers and the ability of the university to unilaterally alter or amend its employees benefits. *Id*. at 309. But the language in the employee handbook in that case is distinguishable from the case *sub judice*. The University of Kentucky's handbook provided that:

> [T]he *University* reserves the absolute right . . . to modify or change, and to abolish or consolidate any of these programs and plans, or any portion thereof, as deemed appropriate and in the best interests of the University and its employees. Section 8.01 of the long-term disability plan includes a "General Disclaimer" that *neither the establishment of the trust, its funding, nor the payment of any benefits shall be construed as giving any Participant or other person any legal or equitable right against the Employer, or any officer or employee thereof, or the Trustee*, except as herein provided. It also provides that under no circumstances shall the terms of employment of any Participant be modified or in any way affected hereby. Plan documents specifically state that nothing in it shall be construed as a contract of employment between the University and any Employee.

*Id.* (internal quotations and brackets omitted) (emphasis added). Thus, the disclaimer in *Furtula* covered not only any inference of a contract of employment, but also explicitly disclaimed that any part of the language regarding the long-term disability plan could be construed as a contract or an offer thereof. Further, the provision permitting modification of the plan allowed the

employer—rather than a third-party, such as a plan sponsor—to modify or terminate the benefits.

In contrast, the disclaimer here provided only that "[n]either the benefit nor this policy is a

contract of employment," (DE 116-4, Plan, Page ID 1514), and the clause permitting

modification limited alterations or termination of benefits to the discretion of the Plan Sponsor.

As the district court noted, whether the Plan disclaimed that it was not a contract of employment

is of no moment. Hackney does not assert that the Plan somehow changed his at-will

employment status. Rather, he claims that he is owed compensation VSI was contractually

obligated to pay out under the Plan, something that the Plan did not expressly disclaim and that

its terms do not prohibit. Accordingly, the Plan is sufficient to be an implied contract under

Kentucky law. *See Parts Depot*, 170 S.W.3d at 363

Finally, VSI argues that the terms of the Plan are not sufficiently definite to constitute a

legally binding agreement. VSI did not raise this argument before the district court, thereby

waiving it. *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1172 (6th Cir. 1996) ("Issues

that are not squarely presented to the trial court are considered waived and may not be raised on

appeal."). Even were we to consider the substance of this argument, it would fail. In Kentucky,

as elsewhere, "an enforceable contract must contain definite and certain terms setting forth

promises of performance to be rendered by each party." *Kovacs v. Freeman*, 957 S.W.2d 251,

254 (Ky. 1997) (citing *Fisher v. Long*, 172 S.W.2d 545, 547 (Ky. 1943)). Additionally, "the

terms of a contract must be sufficiently complete and definite to enable the court to determine the

measure of damages in the event of breach." *Id.* (citing *Mitts & Pettit, Inc. v. Burger Brewing

Co.*, 317 S.W.2d 865, 866 (Ky. 1958)). "Mutuality of obligations is an essential element of

a contract, and if one party is not bound, neither is bound." *Id.* (citing *Morgan v. Morgan*, 218

S.W.2d 410, 412 (Ky. 1949)). Thus, where one party is not bound to perform, its promise is an

illusory one that cannot form an enforceable contract. *See David Roth's Sons, Inc. v. Wright & Taylor, Inc.*, 343 S.W.2d 389, 391 (Ky. 1961). VSI argues that the Plan establishes only eligibility for benefits; it does not establish an entitlement to those benefits. In VSI's view, it held all of the cards in determining whether Hackney would receive benefits and therefore the Plan was an illusory promise. While we agree that the Plan, on its face, does not guarantee that Hackney will receive benefits, it does clearly promise him a meaningful opportunity to participate in the Plan, *i.e.*, to apply for benefits and to have that application fully and fairly reviewed, according to the terms set forth in the Plan. In this regard, the Plan terms are sufficiently definite to constitute a contract.

While we agree with the district court that the Plan was a contract, unlike the district court, we believe there is a genuine dispute of material fact as to whether Hackney was disabled within the meaning of the Plan.

Hackney initially applied for benefits under the Plan on October 11, 2010. VSI and Lincoln approved this application and Hackney was paid benefits through November 2, 2010. The Plan is clear that once eligible for benefits, payments will stop on "the date [the employee] is no longer disabled" or on "the date [the employee] fail[s] to furnish proof that [he or she] continue[s] to be disabled." (DE 116-4, Plan, Page ID 1516.) And in its initial letter granting benefits, VSI and Lincoln informed Hackney of the need to submit further medical evidence of his continuing disability in order to receive benefits after November 2, 2010.

The district court concluded that Hackney's breach of contract claim must fail as a matter of law because he had not rebutted VSI's claim that he did not submit adequate proof of his continuing disability. But as we read the record, Hackney did exactly as he was asked. Along with his November 6, 2010 email, Hackney submitted various medical records, including

- 18 -

treatment notes, radiology reports, and statements from two of his treating physicians opining that Hackney was totally and permanently disabled. Later in the process, Hackney also submitted another letter from one of his treating physicians noting that Hackney's condition had not changed and that he was still restricted from working.

Based on this evidence, we find that Hackney has raised a genuine dispute as to whether he was disabled within the meaning of the plan. The Plan is silent as to what type of proof is necessary to establish continued disability, and thus, it is an open question whether Hackney's proof was adequate to support his claim that he remained totally disabled. VSI essentially argues that the Plan gave it sole and unquestionable authority to determine if Hackney qualified for benefits, regardless of the underlying medical proof. But in the face of strong evidence that Hackney was in fact disabled,[5] the correctness of VSI's denial and the adequacy of Hackney's evidence of disability cannot be decided as a matter of law. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We remand to the finder of fact the question of whether the evidence Hackney submitted in support of his claim was adequate to prove he was disabled under the Plan.

C.

Next, Hackney contends that VSI breached its duty of good faith and fair dealing under both the Agreement and the Plan. The district court rejected this claim for the same reasons it rejected both breach of contract claims. In the district court's view, VSI was merely exercising its rights under both the Plan and the Agreement by denying Hackney severance for "job

---

[5] We reiterate that two third-parties, Northwestern Mutual, Hackney's personal insurer, and the SSA, both found that Hackney was totally and permanently disabled.

abandonment" and denying him salary benefits because he was not "totally disabled." (DE 123, Op., Page ID 1826.)

"In every contract, there is an implied covenant of good faith and fair dealing . . . [and] contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Rainier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991) (citation omitted). The covenant "encompasses a[] duty to act sincerely and without deceit or fraud." *Pioneer Res. Corp. v. Nami Res. Co.*, No. 6:04-465-DCR, 2006 WL 1778318, at *9 (E.D. Ky. June 26, 2006) (citing *Pearman v. W. Point Nat'l Bank*, 887 S.W.2d 366, 368 n.3 (Ky. Ct. App. 1994)). Our court has clarified that:

> In order to show a violation of the implied covenant of good faith and fair dealing, a showing of breach of contract is ordinarily not required; rather, the party asserting the violation must "provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties."

*O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 457–58 (6th Cir. 2005) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2004)).

In light of our earlier conclusions that there are genuine issues of material fact regarding whether VSI breached the Agreement and the Plan, we find that there are also genuine issues of material fact regarding whether VSI breached its duty of good faith and fair dealing under both contracts. Under the Agreement, *all* VSI employees who are "[t]erminated . . . for any reason other than for Violating Conduct" are eligible to receive six months of severance pay. (DE 116-2, Agreement, Page ID 1506.) Likewise, the Plan entitles all qualified employees to participate in the Plan, and it entitles those who, by reason of sickness or injury, "are unable to perform each of the main duties of [their] regular occupation" to Salary Continuation benefits for the duration of their disability. (DE 116-4, Plan, Page ID 1520.) At a minimum, there are genuine disputes

over whether Hackney engaged in "Violating Conduct" and whether he was "totally disabled" within the meaning of the Plan. Thus, VSI's decision to deny Hackney severance and salary continuation benefits may have "denied [Hackney] the benefit of the bargain originally intended by the parties." *O'Kentucky Rose*, 147 F. App'x at 458. It was therefore error for the district court to grant summary judgment to VSI on this claim.

D.

Next, Hackney claims that Lincoln tortuously interfered with the contractual relationship between him and VSI established by the Plan. This claim must fail. In reviewing Salary Continuation Benefit applications pursuant to the Agreement to Pay, Lincoln was acting as VSI's agent. Under Kentucky law, "[a]gents of a party to a contract who act within the scope of their employment cannot interfere with that party's contract." *Harstad v. Whiteman*, 338 S.W.3d 804, 814 (Ky. Ct. App. 2011). Hackney attempts to sidestep this general rule by claiming that Lincoln, in denying his claim for benefits under the Plan, was acting in its own self-interest. Hackney cites *Rawlings v. Breit* for the proposition that an agent may tortuously interfere with his employer's contract if the agent is acting out of self-interest. *Rawlings v. Breit*, Nos. 2003–CA–002785–MR, 2004–CA–000017–MR, 2004–CA–000030–MR, 2005 WL 1415356, at *2–3 (Ky. Ct. App. June 17, 2005). Hackney claims that because Lincoln operated the short-term disability Plan for VSI and its own long-term disability plan as a part of a "seamless" program, Lincoln acted in its own interest in denying Hackney's short-term claim to avoid a potential hit to its bottom line.

Hackney's argument is based on nothing more than conjecture, as there is undisputed evidence that Lincoln's evaluation of short-term disability claims under the Plan was completely separate from its evaluation of long-term disability claims. In her declaration, Janet Olsen, a

disability appeals specialist for Lincoln, stated that "Lincoln National maintains long-term disability policies which are separate and distinct from Advice to Pay Agreements and Salary Continuation Plans/Benefits." (DE 81-6, Olsen Decl. ¶¶ 7–10.) Moreover, the Plan was "self-insured," with "[a]ll salary continuation claims . . . paid by Vascular Solutions." (DE 116-4, Plan, Page ID 1514.) Hackney has not produced any credible evidence that Lincoln's own financial interests were in any way connected to its obligations to review benefits applications under the Plan. Lincoln was not acting outside the scope of its agency relationship, nor was it acting out of self-interest. Therefore, Hackney's tortious interference claim must fail.

E.

Next, Hackney claims that VSI violated Ky. Rev. Stat. § 337.385 when it failed to pay him severance and benefits. Under § 337.385, employers are liable for unpaid wages if they pay "any employee less than wages and overtime compensation to which such employee is entitled." VSI argues that Hackney is exempt from § 337.385's coverage by virtue of § 337.010(2)(a), which excludes "[a]ny individual employed in a bona fide executive, administrative, supervisory, or professional capacity" from coverage under § 337.385. Hackney concedes that he falls within § 337.010(2)(a)'s definition. He points out, however, that one Kentucky Court has allowed for relief to an ineligible employee because the "context require[d] otherwise," and argues that the context of his case likewise calls for relief under § 337.385. (Appellant Br. at 31–32 (citing Ky. Rev. Stat. §337.010(1); *Healthcare of Louisville v. Kiesel*, 715 S.W.2d 246 (Ky. Ct. App. 1986)).)

In *Healthcare of Louisville v. Kiesel*, the plaintiff, the medical director of a healthcare company, sued his employer under § 337.385 to recover severance pay, vacation pay, and pay for personal days. 715 S.W.2d 246, 247 (Ky. Ct. App. 1986). The trial court awarded the

plaintiff damages under § 337.385, and the state appellate court affirmed. It rejected the employer's argument that the plaintiff was exempt under § 311.010(a)(2), agreeing with the trial court that "[i]t is just as unlawful to fail to pay or to withhold a part of the salary of an executive, administrative, supervisory or professional employee as it would be to do so in the case of any other type of employee." *Id.* at 248 (internal quotation marks omitted).

*Kiesel* "support[s] the proposition that, in a given case, an otherwise exempt employee can recover under KRS § 337.385 notwithstanding the limitations stated in § 337.010 if the context 'requires otherwise.'" *Whitewood v. Robert Bosch Tool Corp.*, 323 F. App'x 397, 402 (6th Cir. 2009). However, *Kiesel* is of limited usefulness in deciding when and whether "the context and equities of a *particular* case" overcome the limitations set forth in § 337.010. *See id.* at 402; *see also Fox v. Lovas*, No. 5:10-CV-00219-R, 2012 WL 1567215, at *3 (W.D. Ky. May 1, 2012) (noting that *Kiesel* "offered no explanation why the context of [the plaintiff's] case entitled him to recover damages under KRS § 337.385"). Since *Kiesel*, at least two other Kentucky courts have denied recovery under § 337.385 to exempt employees, and we cited those decisions with approval in *Whitewood*, noting that they were "more consistent with the plain language of KRS §§ 337.385 and 337.010." 323 F. App'x at 402–03 (citing *Rawlings v. Breit*, 2005 WL 1415356, at *6–7; *Haeberle v. McCall, Currens, Topor & Thompson, P.S.C.*, No. 2005-CA-002265-MR, 2007 WL 1201587 (Ky. Ct. App. Apr. 20, 2007)).

Hackney likens his case to *Kiesel*, arguing that he is seeking the same types of compensation sought by the plaintiff in that case. Other than this superficial similarity, however, Hackney does not identify the "context and equities of [his] *particular* case" which would overcome § 337.010's exclusion. *Whitewood*, 323 F. App'x at 402. Because Hackney failed to

show that the "context requires otherwise," the district court did not err in granting VSI summary judgment on this claim.

F.

Kentucky law mandates that "no person shall engage or attempt to engage in the practice of medicine or osteopathy within this state . . . unless the person holds a valid and effective license or permit issued by the [Kentucky Board of Medical Licensure] as hereinafter provided." Ky. Rev. Stat. § 311.560(1). The "practice of medicine or osteopathy" is defined as "the *diagnosis, treatment, or correction* of any and all human conditions, ailments, diseases, injuries, or infirmities by any and all means, methods, devices, or instrumentalities," *id.* § 311.550(10) (emphasis added), and does not include "the practice as a nurse as defined in KRS [§] 314.011." *Id.* § 311.550(11).

Hackney contends that VSI and Lincoln violated Ky. Rev. Stat. § 311.560 by employing unlicensed, out-of-state nurses to review his application for benefits. VSI and Lincoln concede that the nurses who reviewed Hackney's claim were not licensed in Kentucky, but they argue that their actions did not constitute the practice of medicine. As the defendants note, the "practice of medicine" is tied directly to "diagnosis, treatment, or correction." *Id*. § 311.550(10). In their view, the nurses merely reviewed Hackney's application for disability benefits; they did not make any diagnoses or recommendations regarding necessary medical care.

VSI and Lincoln have the better argument here. In support of his position, Hackney cites two opinions from the Kentucky Board of Medical Licensure ("KBML") where out-of-state doctors reviewing insurance claims were found to be engaged in the "practice of medicine" within the statute. But, as the district court found, both of those decisions involved judgments "regarding whether treatment was medically necessary such that it was covered by the insured's

policy." (DE 123, Op., Page ID 1830.) The decisions of the out-of-state physicians in both cases "actually resulted in or could have potentially resulted in a material change to the treatment ultimately received by the insured." (*Id.* at 1830–31.) Unlike the doctors in the two KBML opinions Hackney cites, the nurses who reviewed Hackney's medical file made no determinations regarding the medical necessity of any treatment; they simply determined whether Hackney was capable of performing the necessary functions of his job. Such determinations do not fall within the ambit of § 311.560.

V.

For the foregoing reasons, we reverse the district court's grant of summary judgment on Hackney's breach of contract claims and his breach of the duty of good faith and fair dealing claims. We affirm the district court as to all other claims.