Lewis G. McMULLIN, Sr., Appellant

v.

Phyllis H. McMULLIN, Appellee.

No. 2010–CA–000843–MR.

Court of Appeals of Kentucky.

April 22, 2011.

Richard M. Guarnieri, Johnson, True & Guarnieri, LLP, Frankfort, KY, for appellant.

James A. Shuffett, Lexington, KY, for appellee.

Before CLAYTON, COMBS, and WINE, Judges.

*OPINION*

WINE, Judge:

Lewis G. McMullin, Sr., appeals from a post-dissolution qualified domestic relations order ("QDRO") dividing his pension benefits with his ex-wife, Phyllis H. McMullin. On appeal, Lewis argues that the trial court erred in its interpretation of the settlement agreement between the parties concerning the division of a pension fund and that the legal doctrines relied upon by the trial court were inapplicable. Upon review of the record, we affirm the trial court, albeit not on all of the stated grounds.

**History**

Lewis and Phyllis married in June of 1971 and separated in July of 1999. A petition for dissolution of marriage was filed in January of 2000, and a decree of dissolution was entered in March of 2000. There were no minor children at the time of dissolution. During the marriage, Lewis worked as a driver for United Parcel Service ("UPS"). As a result of his employment with UPS and his participation in the Teamsters union, Lewis participated in a retirement plan. The retirement plan consisted of two different accounts: an employer-funded pension fund plan ("the pension plan") and an optional 401(k) tax-deferred savings plan.

When Lewis and Phyllis separated in July of 1999, Phyllis drafted a handwritten settlement agreement, which purported to govern the division of their property at the time of divorce. The agreement was signed by both parties and witnessed by a notary public. The parties later testified that they did not institute divorce proceedings until several months after the separation agreement because they wished Phyllis to remain on Lewis's insurance during that period.

The handwritten settlement agreement included two provisions which dealt with the pension plan. They were entitled "Article 4" and "Article 5", respectively. Article 4 states as follows:

> Phyllis D. McMullin will receive half of Teamster Retirement at the 20 year service rate. Can Not [sic] be collected until Teamster pension is collected.

Article 5 of the handwritten agreement states as follows:

> 401K—Lewis—

Value will be divided [sic] into half at the time the Divorce is final. Lewis will continue to invest the half for Phyllis. If Phyllis draws her half out early all expenses will be paid by her. Phyllis is responsible for taxes on her half.

No other provisions in the handwritten agreement concern the pension plan. Phyllis testified that at the time this agreement was drafted, she had not seen any documentation concerning the payout methods, including payout amounts for the plan member's age or years of service.

However, the handwritten settlement agreement was not the final agreement between the parties. Lewis took the handwritten settlement agreement to his attorney, the Honorable David Patrick ("Patrick"). Patrick drafted a formal agreement between the parties based upon the handwritten agreement. The new agreement was not identical to the first, but rather, contained language of legal significance not found in the first. Both parties signed the new settlement agreement drafted by Patrick. Phyllis was not represented by counsel when she signed the agreement. The court ultimately incorporated this agreement into its decree of dissolution entered on March 6, 2000. Phyllis testified that at the time this agreement was signed, she still had not seen any documentation concerning the payout methods for the pension plan, including payout amounts for the plan member's age or years of service. She testified that she relied upon the oral information supplied to her by Lewis in regard to what she would be entitled to under the pension plan.

The settlement agreement, as incorporated into the decree, addressed the pension plan as follows:

By Agreement *Wife shall also receive* One-half (1/2) of Husband's teamsters [sic] Retirement at the 20 years of Service rate which *shall be payable* at the time said Pension shall become payable. Wife shall also receive One-half (1/2) Husband's 401–K Benefits calculated as of the date of Dissolution. These funds shall continue to be invested by Husband until such time as they are drawn upon and Wife shall be responsible for all taxes and expenses due on her part upon disbursement.

(Emphasis added.) (Capitalizations in original.) Lewis retired at the age of 55, ten years earlier than both parties expected, after his commercial driver's license was not renewed due to his health.

After he retired, on December 17, 2009, Lewis filed a motion for entry of two QDRO's with respect to the 401(k) plan and the pension plan. Phyllis did not object to entry of the proposed order with respect to the 401(k) plan as drafted by counsel for Lewis. Phyllis did object, however, to the entry of the order Lewis's attorney drafted with respect to the pension plan. Lewis's proposed order stated that the benefit amount payable to Phyllis from the pension plan was "zero." The proposed order indicated that she was not entitled to any payout under the plan as calculated assuming "twenty years of service," and using the decree date of March 6, 2000, when Lewis was 46 years old.[1] Phyllis objected to the entry of the proposed QDRO, contending that the parties intended the pension plan to be divided upon the date of Lewis's retirement, not upon the date of the divorce. In his deposition Lewis testified as follows concerning his belief at the time of contract:

Hon. James A. Shuffett: Now, if you will, look at your Exhibit No. 2 and go to page 4. And for the purposes of the

1. Lewis retired in June of 2008, with 26.5 years of service, when he was 55 years old.

record, read in the sentence that begins on the first line and it starts with the words: By Agreement.

Lewis: By agreement, wife shall also receive one-half of husband's Teamsters' retirement at the twenty years of service rate which shall be payable at the time said pension shall become payable.

Shuffett: Now, then, it's your contention that you knew that she wouldn't get anything, but, yet, you entered into this agreement, is that correct, saying where it would appear that she was going to get something on the face of it. Is that correct?

Lewis: I don't understand your question.

Shuffett: Did you tell her what you felt about the fact that she would receive nothing?

Lewis: No.

. . .

Shuffett: Now, if she was to get nothing, why did you ask your lawyer to put this provision in your settlement agreement?

Lewis: Because she wanted it in there . . . and to get her to hush and to quit arguing about it, *I knew it wasn't worth nothing, so, I said, fine, put it in there. It's not worth nothing.*

*Shuffett: But you did not tell her that you felt it was worth nothing?*

*Lewis: No.*

(Lewis depo., pp. 26–28) (Emphasis added.) The matter was briefed and argued before the Mercer Family Court. The court found that because Lewis intentionally introduced an ambiguity into the settlement agreement, by and through his attorney, the doctrine of *contra proferentem* operated to allow an inference to be drawn against him with respect to the ambiguity. The court further held that the implied covenant of good faith and fair

dealing would require that inferences be drawn against Lewis with respect to the ambiguity in the contract. The trial court also held that Lewis's refusal to let Patrick, his former attorney, testify before the court by invoking his attorney-client privilege, was further grounds to construe the ambiguity in favor of Phyllis. Accordingly, the trial court construed the contract as requiring application of the twenty-year rate, calculated at the time of Lewis's retirement, which entitled Phyllis to payment of one-half of $900.00, or $450.00 monthly.

Lewis moved the court to alter, amend, or vacate its QDRO. The court granted the motion, making some additions to the QDRO, but still construed the contractual provision about the pension plan as requiring division on the date of retirement. Lewis now appeals to this Court.

## Analysis

On appeal, Lewis argues (1) that the contract was ambiguous as to the date to be used for calculation of the pension benefit and that the intention of the parties was for the date of the divorce decree to be used; (2) that the court could not have relied upon Phyllis's beliefs at the time of the contract because she never saw the pension plan benefit chart and because the contract expressly stated that neither party was relying upon the oral assertions of the other; (3) that the court ignored the fact that Phyllis failed to retain her own counsel; (4) that the court ignored the fact that Phyllis received the bulk of the marital estate; (5) that the court failed to follow Kentucky law which mandates that pension benefits are to be divided as of the date of the divorce decree; (6) that the doctrine of *contra proferentem* was inapplicable; and (7) that the covenant of good faith and fair dealing was inapplicable.

The terms of a settlement agreement, as incorporated into a decree of dissolution of marriage, are enforceable according to contract principles. Kentucky Revised Statute (KRS) 403.180(5); *Money v. Money*, 297 S.W.3d 69, 71 (Ky.App.2009). The interpretation of a contract is a matter of law and is reviewed by the Court *de novo*. *Money*, supra, at 71; *Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky.App.1998). Thus, we review the agreement anew, giving no deference to the trial court.

We first address Lewis's argument that the terms of the contract were ambiguous and that the intention of the parties was for the pension benefit to be calculated as of the date of the divorce decree because all of the other terms in the contract clearly refer to the date of the divorce decree. A contractual provision is ambiguous if the provision is susceptible to multiple or inconsistent interpretations. *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 105 (Ky.2003); *Transport Ins. Co. v. Ford*, 886 S.W.2d 901, 905 (Ky.App. 1994). If an ambiguity exists, our task is to "gather, if possible, the intention of the parties from the contract as a whole." *Frear*, 103 S.W.3d at 106, *quoting Whitlow v. Whitlow*, 267 S.W.2d 739, 740 (Ky.1954). In determining the intention of the parties, we "will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written . . . ." *Whitlow*, supra, at 740. However, in the absence of an ambiguity, the terms of the contract will be strictly enforced as written. *Id.*

In the present case, we agree with Lewis that the provision of the contract dealing with the pension benefit is ambiguous as the provision is susceptible to more than one interpretation due to the missing "age" term. As previously noted, the relevant contractual provision states that Phyllis shall receive "One-half (1/2) of [Lewis's] teamsters [sic] retirement at the 20 years of Service rate which shall be payable at the time said Pension shall become payable." This provision clearly denotes that Phyllis is entitled to one-half of Lewis's pension calculated according to the "20 years of service" rate. However, the benefit chart cannot be applied without *both* years of service *and* beneficiary's age at the time of retirement. The provision does not include what age is intended to be used for the calculation.

Phyllis argues that the provision is not ambiguous because it states that the pension benefit "shall be payable at the time said Pension shall become payable." She argues that this phrase clearly stands for the proposition that the benefit is to be calculated at the time the pension becomes payable rather than at the time of the divorce decree. However, this argument neglects that a term is missing from the provision, namely, the date of calculation. Indeed, the word "payable" is much different from the word "calculate" and the above provision does not state when such benefit shall be calculated. Without an age with which to determine the benefit, or a date by which Lewis's age could be determined therefrom, the provision is ambiguous as it may be fairly read in the manner advanced by both Phyllis and Lewis. Indeed, the contract could be read to mean that the benefit at the 20–year service rate was intended to be divided upon the date of the decree or it could be read to mean that it was intended to be divided upon the date of Lewis's retirement.

As the contract provision is ambiguous, we must attempt to glean the intention of the parties from the body of the contract and the surrounding circumstances. *Frear*, 103 S.W.3d at 106. We disagree with Lewis that the intention of the parties was that the date of the divorce decree be

used simply because the decree date was used elsewhere in the contract. If anything, it may lead to the opposite conclusion, as the question is begged why the date was not included in this particular provision while care was taken to include the decree date in other provisions of the contract. Phyllis's testimony indicated that she did not intend the decree date to be used. In fact, Phyllis testified that she had not even seen the benefits chart and only based her determination on what Lewis told her about the plan. Thus, further inquiry into the intent of the parties is necessary.

This brings us to Lewis's second argument: that the trial court ignored Phyllis's lack of knowledge about the pension plan at the time of contract. Lewis argues that all of the evidence pointed to the fact that he was intimately aware of all of the details of the pension plan while Phyllis had no knowledge of the plan benefit chart. Lewis points to the fact that a merger or integration clause in the contract stated that neither party was relying on any promise or representation made by the other party except as expressly provided in the contract. However, Lewis conflates two separate ideas here: Phyllis's *intent* at the time of contract and Phyllis's *knowledge* at the time of contract. A court may still look to the intent of a party or parties, even if that party or parties are not fully informed as to all of the circumstances at the time of contract. Here, although Phyllis did not have a detailed awareness of the plan's payout chart, she clearly had an intent formed about her entitlement to a portion of the pension upon payout. Her testimony may be considered on this matter because courts may look to extrinsic evidence where an ambiguity exists in a contract. *Frear*, 103 S.W.3d at 106.

We next consider Lewis's arguments that the trial court "ignored" the fact that Phyllis failed to retain her own counsel and that Phyllis "received the bulk of the marital estate." These two arguments may be quickly dispensed with. To begin, the fact that Phyllis did or did not have counsel is irrelevant for the purposes of our review, as the trial court found (and we agree) there was an ambiguity in the contract. Therefore, there can be no argument that Phyllis should be bound by some specific term in the agreement. Rather, as an ambiguity exists due to the *absence* of a specific term (the age/date to be used for the calculation), and as the trial court supplied the missing term, Phyllis is not being bound to some term already in the contract of which counsel might have made her aware. Likewise, we find Lewis's other argument concerning the portion of the marital estate received by Phyllis to be irrelevant as there is no allegation that the agreement was unconscionable. Parties to a dissolution action are able to contract for a distribution of assets and debts however they see fit so long as the result is not unconscionable. *Money*, 297 S.W.3d at 73.

Accordingly, we now address Lewis's argument that the trial court failed to follow Kentucky law, which mandates that pension benefits are to be "divided" as of the date of the divorce decree. We are compelled to point out that Kentucky law *actually* mandates that pensions be "valued" as of the date of the divorce decree, not "divided" upon the date of the decree. *Foster v. Foster*, 589 S.W.2d 223 (Ky.App. 1979). Indeed, it is often the case that pensions are not payable, and cannot be divided, until the employee has reached the age of retirement. In the present case, the contractual provision in question *did* value the pension as of the date of the divorce decree because Phyllis was only entitled, under the terms of the contract,

to one-half of the portion of the pension Lewis accrued while the parties were still married, or "20 years." [2] Thus, Phyllis was not entitled under the contract to "share in any pension benefits earned after divorce and before retirement." *Id.* at 225. Regardless, Lewis's argument based upon *Foster* suffers a fatal flaw as parties may contract to any terms they choose for the division of property so long as such terms are not unconscionable. *See, e.g., Money, supra.* As such, *Foster, supra,* and its progeny are not applicable because they involve a *court's* division of a pension plan rather than a private agreement as to a pension plan. Lewis has not argued that the agreement should not be enforced due to unconscionability or otherwise.

◼ Accordingly, we now reach Lewis's two final, and most substantive arguments. Lewis argues that the trial court erred in applying the doctrine of *contra proferentem* and the implied covenant of good faith and fair dealing. He argues that both doctrines were inapplicable and that the trial court relied upon same in error.

The first doctrine in question, the rule of *contra proferentem,* is a maxim of contract interpretation that ambiguities will be construed against the drafter of a contract when the contract is susceptible of two meanings. 2 *Restatement Contracts,* 2d, § 206. This maxim has long been followed in the Commonwealth. *B. Perini & Sons v. Southern Ry. Co.,* 239 S.W.2d 964, 966 (Ky.1951). Lewis argues that this long-standing principle of contract construction cannot be applied against him because his attorney included a clause in the contract stating that "no provision [of this agreement] shall be interpreted against any party because that party or their legal representative drafted the provisions hereof." One must assume that the purpose of such a clause is to address unintentional ambiguities present in a contract.

However, to allow this type of clause to effectively control the Court's interpretation of a contract in situations where a party has *intentionally* introduced an ambiguity into a contract would be unconscionable and/or run counter to public policy.[3] Indeed, the law has long condemned allowing an individual to benefit from his own fraud or deceit in drafting or procuring a contract or otherwise. *Cf. Restatement* (2d) *Contracts* § 178(2)(a) (In weighing the enforcement of a term against public policy, account should be taken of the parties' justified expectations); *Restatement* (2d) *Contracts* § 178(3)(c) & (d) (In weighing the enforcement of a term against public policy, account should be taken "of any misconduct involved and the extent to which it was deliberate"); *Suter v. Mazyck,* 226 S.W.3d 837, 843 (Ky.App. 2007) (Doctrine of unclean hands "forecloses relief to a party who has engaged in fraudulent, illegal, or unconscionable conduct . . ."); *CJS, Equity* § 109 (Clean hands maxim bars relief to those guilty of improper conduct and is invoked to protect the integrity of the court).

Regardless, there are other reasons the ambiguity should be construed in the way the trial court construed it. Such reasons have nothing to do with the doctrine of *contra proferentem.* One such reason is that the language in the agreement re-

---

**2.** Lewis testified that he had about 19.5 or 20 years of service at the time of the agreement.

**3.** As previously stated, the trial court made a factual finding that Lewis intentionally introduced the ambiguity into the contract and that he did so knowing that Phyllis was expecting to receive some portion of the pension. Lewis has not requested a reversal of this factual finding on appeal. We must assume that he does not dispute this finding.

garding the pension clearly suggests that the parties intend Phyllis to get *something*. As previously stated, the court is directed to look to the intent of the parties where an ambiguity exists which cannot be resolved on the face of the contract. *Frear*, 103 S.W.3d at 106. Indeed, the provision in the contract regarding the pension contains the phrases: "Wife shall ... receive" and "Retirement ... shall be payable." It is apparent that there was an intention that there existed something to be received by "Wife."

Further, Lewis's testimony that he was oblivious to Phyllis's state of mind or whether she thought she would be receiving some amount greater than "zero," is not veracious. As previously stated, the trial court found that Lewis "intentionally introduced the ambiguity into the Settlement Agreement, knowing that the Respondent was expecting that she would receive a portion of the pension at some time in the future." We conclude that to allow a party to intentionally introduce ambiguity into a contract in order to secure the other party's assent, only to later claim unilateral mistake or otherwise, would be abhorrent to public policy. Public policy dictates that a wrongdoer should not be allowed to profit from his or her own wrongdoing. *See, e.g., Hildebrand v. Holyoke Mut. Fire Ins. Co.*, 386 A.2d 329, 331 (Me.1978) ("[T]he general rule [is] that it is contrary to public policy to allow one to benefit from his own wrongdoing."); *Vista Designs, Inc. v. Silverman*, 774 So.2d 884, 888 (Fla.2001) ("[P]ublic policy ... dictates that a party should not benefit from its wrongdoing"); *Century–National Ins. Co. v. Garcia*, 51 Cal.4th 564, 570, 120 Cal.Rptr.3d 541, 246 P.3d 621, 625 (2011) ("[A] wrongdoer should not benefit from his or her wrongdoing"); *Kulubis v. Texas Farm Bureau Underwriters Ins. Co.*, 706 S.W.2d 953 (Tex.1986) ("[P]ublic policy dictates that a wrongdoer should not benefit

from his wrongdoing"); *See also, e.g.,* KRS 381.280 (Husband, wife, heir-at-law, or any other beneficiary under a policy of insurance may not collect thereunder if they have been convicted of a felony for taking the insured's life). As Lewis intentionally introduced the ambiguity into the contract, we will not construe the provision in his favor, thus allowing him to benefit from his own malfeasance.

■ Lewis's final argument is that the trial court erred in applying the implied covenant of good faith and fair dealing. Lewis contends that the implied covenant of good faith and fair dealing only applies in situations where it is alleged that one party has breached the terms of a contract by his or her conduct subsequent to the execution of the contract. He contends that the covenant is not applicable in cases merely involving the interpretation of contractual ambiguities. We agree with Lewis that the implied covenant of good faith and fair dealing only applies to the performance or enforcement of a contract. *See, e.g., Farmers Bank and Trust Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky.2005) (The implied covenant of good faith and fair dealing imposes upon parties a duty to do everything necessary to "carry out" the contract.); *RAM Engineering & Const., Inc. v. University of Louisville*, 127 S.W.3d 579, 585 (Ky.2003). Indeed, the official comments to the *Restatements* (2d) *of Contracts* § 205 make clear that the covenant "does not deal with good faith in the formation of a contract." *Restatements* (2d) *of Contracts* § 205, *Official Comment (c)*. However, it is of little consequence in the present case as we have already found that the trial court was correct to construe the ambiguity against Lewis on other grounds.

Accordingly, the QDRO entered by the trial court is hereby affirmed.

ALL CONCUR.